UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

ESTATE OF JOHN OLIVA,            :
                                :
          Plaintiff,            :    HONORABLE JOSEPH E. IRENAS
                                :    CIVIL ACTION NO. 01-2259 (JEI)
     v.                         :
                                :         **OPINION**
STATE OF NEW JERSEY, et al.,    :
                                :
          Defendants.           :


**APPEARANCES:**

WILLIAM H. BUCKMAN LAW FIRM
By:  William H. Buckman, Esq.
110 Marter Ave., Suite 209
Moorestown, New Jersey 08057
          Counsel for Plaintiff

DECOTIIS, FITZPATRICK, COLE & WISLER, LLP
By:  Catherine E. Tamasik, Esq.
Glenpointe Centre West
500 Frank W. Burr Blvd.
Teaneck, New Jersey 07666
          Counsel for all Defendants except Defendant Waldron

LAW OFFICES OF ALAN L. ZEGAS
By: Edward J. Byrne, Esq.
552 Main Street
Chatham, New Jersey 07928
          Counsel for Defendant Waldron


**IRENAS**, Senior District Judge:

     This employment retaliation suit arises out of the events that
transpired over the course of New Jersey State Trooper John Oliva's
employment with the New Jersey State Police.  According to Oliva's
estate, the Plaintiff in this case, Oliva was continually harassed
by other members of the State Police on account of Oliva's
"whistle-blowing" about alleged racial profiling in conducting
traffic stops.  This harassment, Plaintiff alleges, was so severe

that it caused Oliva to take his own life.

The 16-count Second Amended Complaint asserts federal and state law claims for damages and injunctive relief[1] against the State of New Jersey[2] and 21 individual defendants.[3]  All Defendants presently move for summary judgment on all remaining claims.[4]

## I.

Immediately following graduation from the State Police Academy in November, 1998, Oliva was assigned to Troop A, Bellmawr Station as a "new recruit."[5]  (Attwood Cert. Ex. B-D; Buckman Cert.

---

[1]  The Court exercises subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1367.

[2]  Plaintiff's Second Amended Complaint identifies this Defendant as "State of New Jersey, Department of Law and Public Safety, Division of State Police."  The Court will use "State of New Jersey" or "State Police" when referring to this Defendant.

[3]  Two other individual defendants were previously dismissed from this action.

[4]  The Motion was originally submitted by all Defendants except Defendant Waldron, who has retained separate counsel. However, Defendant Waldron has informed the Court that he joins the present Motion.

[5]  Oliva performed exceedingly well at the Academy, earning an award for "highest overall physical average," and maintaining an academic average of 88.9.  (Pl's Ex. 7)  Although he was a "new recruit" to the State Police, Oliva had extensive experience in other law enforcement positions.  He began his career in the Marines, serving four years before his honorable discharge. Oliva spent another four years as a corrections officer in Atlantic County (Pl's Ex. 1) before becoming a municipal police officer.  He served as a municipal police officer for six years before entering the State Police Academy.  (Pl's Ex. 3-4)  During his time as a municipal police officer, he was repeatedly recognized by his superiors for his "outstanding performance."

Ex. 6, 18)  There he was paired with Trooper Patrick Gallagher,[6] who was assigned to be his Trooper Coach[7] (Attwood Cert. Ex. D; Buckman Cert. Ex. 9, 18), and direct supervisor.  (Buckman Cert. Ex. 41, NJSP532[8])

As part of his training, Oliva accompanied Trooper Gallagher on traffic patrol, where Trooper Gallagher was to instruct Oliva on the proper procedures for making traffic stops.  (Attwood Cert. Ex. E)  However, according to Oliva, Trooper Gallagher taught him to "profile" (i.e., make traffic stops without probable cause).[9] Specifically, Oliva claimed that Trooper Gallagher identified cars that he believed looked like "a good car stop" based on the race of the occupants, the type of car, or whether the car had out-of-state plates.[10]  (Attwood Cert. Ex. E; Buckman Cert. Ex. 41, NJSP559[11])

---

(Pl's Ex. 4)

[6]  Trooper Gallagher is not a party to this suit.

[7]  All new recruits are assigned a Trooper Coach for their first two months on the job.  (Attwood Cert. Exs. D, YY)

[8]  Exhibit 41 is the Deposition Transcript of Gayle Cameron, with attached exhibits from the deposition.  The Court will refer to Bates numbers (e.g., "NJSP532") when citing pages from the deposition exhibits.

[9]  In his own words, Oliva described "profiling" as "stopping someone without cause of [sic], because of their race, whether they're whites that fit your description of people that don't belong or their [sic] minorities that fit in your mind what you'd determine as people that don't belong."  (Buckman Cert. Ex. 41, OL02712)

[10]  Oliva gave specific examples of "good car stops": "you have a 1970 Cadillac, with no hubcaps, with damage to the vehicle, with four minorities in the vehicle coming out of Camden onto the highway.  That would be a good car stop. . . . We would

Additionally, Oliva claimed that Trooper Gallagher instructed him to make false statements in police reports so as to cover-up the illegal stops and attendant searches.  (Attwood Cert. Ex. E)  Oliva explained,

> [Trooper Gallagher] would tell me, you know pretty much verbatim what to say in the [police] reports . . . . The only thing that changes in these reports are people and the mileposts.  You know, that's the only thing that changes. . . . it's cars are traveling, failure to maintain lanes, it was the statute to get us to stop these cars, and then . . . he would tell me to write that the [driver] said that he just went to Camden [New Jersey] to buy drugs, something that that [sic] outrageous. I mean nobody . . . nobody says that. This is the kind of stuff he was telling me to write and I was writing it, you know, the [driver] said this, people said that . . . . this happened a lot and low and behold he'd find an empty baggy or whatever the case was, and then we'd lock these people up,[12] bring them back to the station and then he'd tell me what to write. . . . [T]hat's how we basically MO'd.

(Id.)

---

also target whites that would come out of predominantly Camden, which is predominantly blacks and Hispanics. . . . [W]hat I mean by this is, had the appearance of being an affluent white driving an expensive car."  (Buckman Ex. 41, OL02698)

[11]  Notably, Oliva was never deposed in this action.  He did, however, give interviews in connection with State Police internal investigations.  Defendants assert that Oliva's statements during those interviews are inadmissible hearsay and may not be considered by the Court.  This Court's inclusion of Oliva's interview statements in this portion of the Opinion is only to provide a comprehensive description of the relevant facts, and is not meant to be an implicit ruling on Defendants' argument.  *See infra,* n. 61.

[12]  According to Oliva, the pretextual stops and searches were a means to Trooper Gallagher's ultimate goal of maintaining high arrest numbers.  (Attwood Cert. Ex. E; Buckman Cert. Exs. 9, 41, NJSP5720, OL02701, OL02708-09)

Oliva was immediately disturbed by Trooper Gallagher's actions.  He was concerned about his own liability for violating citizen's civil rights,[13] even though he was acting under his supervisor's orders.  (Buckman Cert. Ex. 41, NJSP567-569)  After his first night on patrol with Trooper Gallagher, Oliva spoke to several peers-- local police officers and fellow state troopers-- to voice his concerns.[14]  (Id., NJSP569, NJSP573-576)

Then, approximately two weeks later, still troubled by Trooper Gallagher's practices, Oliva reported his concerns to Sergeant Manny Gordillo.[15]  (Id., NJSP564, OL02700)  Oliva stated,

> [I]t got to the point that it got that bad for me that my conscious [sic] took over despite . . . everything that could happen if I went and complained about my coach.  It came a time where my conscious [sic] took over between right and wrong despite the fact that I knew it could be . . . my career could be ruined if I complained [about] my coach. . . .  So, what I was dealing with internally throughout the time, my first two weeks . . . I went to my Sergeant and complained. . . . I complained to him that I was uncomfortable with

_____

[13]  Oliva explained, "I knew fully well that what we was [sic] doing was illegal and against the law and my main concern was that I was gonna get indicted and was going to lose my home, and my pension, and I was gonna go to federal prison for violating these people's rights."  (Buckman Ex. 41, OL02699)

[14]  There is also some evidence in the record that Oliva and Trooper Gallagher had a "conversation" about Oliva writing the reports for stops and arrests made by Trooper Gallagher. However, it appears the exchange was limited to the issue of Oliva writing reports for Trooper Gallagher, and not the alleged profiling practices.  (Buckman Cert. Ex. 41, NJSP538-539)  Oliva's understanding from this exchange was that Trooper Gallagher was ordering him to write the reports.  (Id., NJSP540)

[15]  Sergeant Gordillo has never been a party to this suit.

5

the practices that were going on[16]. . . . I went and complained about my coach. . . . the primary concern was these illegal things we were doing on the road. . . . So when I went to my Sergeant that was why I went to him, to complain about-- that I can't do this anymore.

(Id., NJSP548, NJSP565-NJSP567)  According to Oliva, Sergeant Gordillo responded by telling Trooper Gallagher to "cut this crap off that day" and "suspending" him from the location in Camden where he was making all of the traffic stops.  (Id., NJSP572, OL02709, OL02728)  Sergeant Gordillo, however, denies that Oliva complained to him about profiling activities.  (Attwood Cert. Ex. F)

Oliva believed that the other troopers knew that he had complained about his Trooper Coach.  Specifically, Oliva stated that his complaint had become "the talk of the station . . . because in the history of the State Police . . . nobody's ever complained about their coach before."  (Buckman Ex. 41, OL02709) He also reported that salt was placed in his work mailbox shortly after he made his complaint.[17]  (Buckman Ex. 41, OL02729, OL02731)

---

[16]  According to Oliva, "a number of people" at Belmawr Station were engaging in profiling practices, although he only identified Trooper Gallagher by name.  (Buckman Cert. Ex. 41, OL02701, OL02708)  Oliva further stated that everyone at the station knew which troopers engaged in profiling.  (Id., OL02703)

[17]  The term "salty" is a derogatory term used for certain troopers.  Defendant Colonel Dunbar testified, "when I was a trooper the worst thing that you wanted to have somebody say is that you were salty.  And that basically meant that . . . you were a hot dog. . . you're just acting . . . more senior than you were, that . . . you did not have respect for other troopers. . . . I've heard salt being put in the shoes to indicate that that particular person was salty."  (Attwood Cert. Ex. V)  Oliva

6

After completing the two-month Trooper Coach training, Oliva remained at Belmawr Station for approximately four months. (Buckman Ex. 47, OL00924; Buckman Ex. 41, OL02695)  Nothing in the record indicates that any other incidents occurred during that time.

However, according to Oliva, news of his complaint had spread to Woodbine Station, where he was transferred in May, 1999.  He explained, "it was the whole stigma that I had gotten labeled from the beginning because [I complained about Trooper Gallagher.] . . . I was someone who was not gonna go along with the program." (Buckman Ex. 41, OL2731, OL02736)

Within Oliva's first few months at Woodbine Station, his immediate supervisor, Defendant Edward Sokorai, issued allegedly unwarranted negative performance evaluations of Oliva.  (Buckman Cert. Ex. 47, OL00925-26; Buckman Cert. Ex. 41, OL02736)  On August 22, 1999, Oliva received a Performance Notice for "failing to continually take proper traffic enforcement action . . . after repeatedly being advised to desist from this course of action by his supervisor."[18]  (Attwood Cert. Ex. G)

---

stated, "[y]ou come to work, you keep your mouth shut and you do what you're told to do.  If you don't do these things you will be labeled salty."  (Buckman Cert. Ex. 41, NJSP547)

[18]  The record suggests that Oliva and Defendant Sokorai had previous disagreements over the problem reported in the August 22nd Performance Notice, although the substance of their conversations is not clear.  (Buckman Cert. Ex. 47, OL00925-26) Defendant Sokorai stated that he verbally counseled Oliva about treating motorists too leniently during traffic stops.  (Attwood Cert. Ex. G)

Oliva received another negative Performance Notice on November 27, 1999, which stated that "Oliva failed to make corrections to [an] accident report prior to departing the station after being advised to do so." (Id.)  According to Oliva, both Performance Notices were unwarranted and, although he did not formally contest the notices through the established grievance procedure, he did raise the issue with Assistant Station Commander, Defendant Sergeant Gary Austin.  (Buckman Cert. Ex. 47, OL00926-28)

Then in mid-November, 1999, Defendant Sergeant Bruce Meyers approached Oliva at the beginning of Oliva's shift.  (Buckman Cert. Ex. 47, OL00928-29)  According to Oliva, Defendant Meyers summoned him into an office, shut the door, and presented Oliva with an anonymous note.  (Id.)  Defendant Meyers, however, denies giving the note to Oliva.  (Attwood Cert. Ex. I)  The note reads in its entirety,

> HEY OLIVA, EVERYONE AROUND HERE IS GETTING TIRED OF YOUR SHIT.  WHETHER YOU LIKE IT OR NOT, YOU'RE STILL A RECRUIT.  IF YOU DON'T LIKE IT YOU CAN GO BACK TO YOUR OLD DEPARTMENT WHERE YOU CAME FROM.  YOU BETTER START DOING WHAT YOU'RE TOLD TO DO.  WE'RE ALL WATCHING YOU OLIVA.

(Attwood Cert. Ex. H)(caps in original).

A few months later, in February, 2000, Oliva was transferred to the Buena Vista Station, where his situation allegedly worsened. Oliva alleges that his supervisor, Defendant Waldron, engaged in profiling and expected Oliva to model his practices.  Oliva explained,

8

> [Defendant Waldron] would drive . . . to the Budget
> Lodge Motel and profile cars, stop somebody . . . lock
> somebody up for narcotics. . . . He brings me to the
> Budget Lodge and he is telling me that this is where all
> the scumbags . . . come out of this motel and they're
> all drug dealers, and you know, you look for cars with
> out of state tags . . . he's going on and on . . . and
> I'm listening to the radio and it's going in one ear and
> out the other because if he thinks I'm going to do this
> for him, he's out of his mind. . . .
>
> He goes out, he gets on the street, within 45 minutes
> he's got someone under arrest . . . he wants you to lock
> people up and I'm not gonna go pull you over because you
> look in my eyes like some scumbag.  There's no probable
> cause for the stop because you're white and you're
> driving a car that looks like a shit bag or you're black
> driving a car with out of state tags. . . . [H]e took me
> out there to the Budget Lodge and try [sic] to tell, to
> get me on line with this.

(Buckman Ex. 41, OL02740, OL02743)

According to Oliva, in late April, 2000, when Defendant

Waldron verbally advised him that he was not "locking up enough

people," Oliva objected, stating that he was "not going to go sit

in the Budget Lodge parking lot and profile."  (Buckman Cert. Ex.

41, OL02746)  Allegedly, Defendant Waldron raised his voice and

stated that as long as the police report stated a violation, "it's

okay to profile."  (Id., OL02746)

Defendant Waldron's version of the conversation is

significantly different.  He testified,

> I remember having that discussion with [Oliva] about the
> difference between racial profiling and [criminal]
> profiling at the time.  And the feeling I got from that
> conversation with him . . . was that he . . . didn't
> want to work and he was beginning to take things that .
> . . were current hot issues, which was racial profiling
> say at the time, and . . . manipulating them into a way
> that, well, because I believe that this is what this is,

> I'm not going to do it.  Meaning I don't want to arrest
> anybody because I'm lazy . . . and because of that, I am
> going to say . . . I think that every arrest might lead
> to me being civilly sued by somebody and, therefore, I
> am not going to do my job. . . .
>
> [Oliva] objected to arresting people, not to targeting
> people without probable cause and it was explained to
> him in no uncertain terms what was legal and what was
> not legal regarding car stops.

(Attwood Cert. Ex. K)

A week later, Oliva received a routine performance evaluation from Defendant Waldron.  (Buckman Cert. Ex. 41, OL02749)  Oliva perceived the evaluation as unjustifiably negative and immediately wrote Sergeant Callen a letter summarizing his version of the above conversation, and requesting to speak with Callen about the evaluation.  Oliva wrote, "I believe that my evaluation was based not upon four months of hard work, but rather a conversation between me and Tpr. I. Waldron that took place one week prior to the deadline of said evaluation."  (Attwood Cert. Ex. L)  The letter states that "documentation" is enclosed which substantiates Oliva's contention that he has performed "in an exemplary fashion" (Id.), however, those documents are not included in the record before the Court.[19]

According to Oliva, after Sergeant Callen read the letter, he called Oliva at home (Oliva was off-duty at the time) to discuss

---

[19]  Oliva reported to State Police internal investigators that the documents included previous evaluations, letters of appreciation and commendation, and a "grid" comparing Oliva's arrest numbers with other troopers in the station.  (Buckman Cert. Ex. 41, OL02752, OL02756)

the issue.  Oliva stated that he told Sergeant Callen that he
believed the negative evaluation was just one instance of
harassment in a general pattern of retaliation that he had
experienced since he began with the State Police.  (Buckman Ex. 41,
OL02757)  Oliva further explained,

> I went on about the whole thing, about my coach . . .
> I said this should never have happened . . . I'm not
> gonna do it . . . if he[20] wants to profile that's his
> business, I said I'm not doing it. . . . And when I
> said this to Callen about the profiling and I'm not
> gonna do it he said whoa, easy on that P word.  Like
> he didn't want to go there, he didn't want to talk
> about it, cause it was a hot topic back then
> profiling.

(Buckman Ex. 41, OL02757, OL02761)  Ultimately, Sergeant Callen
directed Defendant Waldron to create a new evaluation, which gave
Oliva highest marks in all rating categories.  (Attwood Cert. Exs.
K, L)

In August, 2000, Oliva was transferred back to Woodbine
Station.  Shortly after arriving, in late September, another
incident occurred.  A negative letter about a trooper was
anonymously posted on a website called "Troop Rumblings."  (Buckman
Cert. Ex. 47, OL00935-36)  Defendants Sergeant Gary Austin and
Lieutenant Horace MacFarland allegedly confronted Oliva, accusing
him of making the posting.  (Id., OL00936)  Oliva described the
incident as "a closed door meeting" where Defendants Austin and
MacFarland "interrogated" Oliva for an hour, while he denied

---

[20]  It is unclear whether Oliva was referring to Trooper
Gallagher or Defendant Waldron.

authoring the posting.  (Id.)

Then, on October 9, 2000, Oliva received another anonymous letter.  (Buckman Ex. 47, OL00937)  Oliva came to work at the beginning of his shift to discover that the gear in his locker had been tampered with,[21] and a note had been placed inside.  (Id.) The note stated, "HEY 'THERE BIG FUCKIN DADDY' TAKE YOUR SALTY FUCKIN ATTITUDE BACK TO THE LOCAL DEPTS.  WE'RE ALL WATCHING YOU OLIVA.  FILL OUT A TRANSFER REQUEST, IT'S TIME YOU MOVED ON." (Attwood Cert. Ex. H)(caps in original)  An identical note was also taped to the top of a toilet seat in the bathroom.  (Buckman Cert. Ex. 47, OL00938)  At the time, Oliva did not report this incident to anyone because he believed that nothing would be done about it. (Id., OL00939-40)

Three days later, Oliva came to the Woodbine Station to begin his shift.  (Buckman Cert. Ex. 47, OL00940)  Trooper James Harris[22] was to accompany Oliva on patrol that night.  (Id.)  According to Oliva, he sat down in an empty office to wait for Trooper Harris, who was watching a baseball game.  (Id., OL00941)  When Trooper Harris found Oliva in the office, he accused Oliva of sleeping on the job.  (Id.)  Oliva denied that he was sleeping and attempted to explain that he was waiting for Trooper Harris.  (Id.)

_____

[21]  Oliva stated that some of his gear was not in its usual place and that his leather was scratched and scuffed.  (Buckman Cert. Ex. 47, OL00937)

[22]  Harris was originally named as a Defendant to this suit but has since been dismissed.

Nonetheless, Defendant Sergeant Raymond Lupu issued Oliva a negative Performance Notice for "failure to get the appropriate rest before arriving for work."[23] (Attwood Cert. Ex. P)[24]

Then, on October 18, 2000, Oliva received a third anonymous note-- just nine days after the previous note.  The note, which was placed in Oliva's work mailbox, states, "Boy.......  I Think [sic] I'll come in and 'work' an overtime, and go to sleep in the back room cause [sic] I'm all caught up.  Move on there tough guy, you still have Bridgeton, Port and Woodstown."  (Attwood Cert. Ex. H)  At the time, Oliva did not report the note to anyone for the same reasons he did not report the previous note.  (Buckman Cert. Ex. 47, OL00942)

Less than a week later, Oliva injured his back while off-duty and took sick leave.  (Attwood Cert. Ex. Q)  During his sick leave, Oliva confided in Lieutenant Colonel Vincent Modarelli, stating that he was considering resigning from the State Police because of the harassment he had experienced.[25]  (Attwood Cert. Ex. S)

---

[23]   The Performance Notice states "All information above was supplied to Sgt. Raymond Lupu . . . by Tpr. I James Harris." (Attwood Cert. Ex. P)

[24]   Oliva received two other negative Performance Notices within the same month.  One notice was issued because Oliva missed a shift after misreading his schedule.  (Attwood Cert. Ex. N)  Another notice was issued when Oliva contacted the dispatch unit directly, rather than his station, to report his attendance at Galloway Township Municipal Court.  (Attwood Ex. O)

[25]   Colonel Modarelli was a family friend and not in Oliva's chain of command.  (Attwood Cert. Ex. S)

Colonel Modarelli contacted Defendant Lieutenant William Meddis, Acting Bureau Chief, Quality Control and Adjudication Bureau, to help Oliva find a solution to his problem other than quitting the State Police.  (Id.; Attwood Cert. Ex. T)

Soon after, on December 27, 2000, Defendant Meddis and Defendant Sergeant Robin Blaker[26] interviewed Oliva about the harassment he experienced.  (Buckman Cert. Ex. 47, OL00923-OL00944) Oliva requested to have his attorney present for the interview, but Defendant Meddis would not allow it, stating that State Police policy does not allow it.  (Attwood Cert. Ex. T)  While Oliva described the incidents involving the anonymous notes, and the negative Performance Notes, he did not tell Defendants Meddis and Blaker what he believed to be the reason for the harassment-- his refusal to engage in illegal profiling.  Indeed, Oliva made no reference at all to alleged racial profiling by anyone.  Oliva did state, however, that he believed that a secret group of State Police officers, called the "Lords of Discipline," were responsible for the harassment.  (Attwood Cert. Ex. X; Buckman Cert. Ex. 28)

After the interview, Internal Investigation 2001-01HI was opened on the matter.  (Attwood Cert. Ex. X)  The stated purpose of the investigation was to "explore[] the existence of 'The Lords of Discipline' (L.O.D.), an alleged group of troopers located in the Troop 'A' area who operate covertly for the purpose of hazing and

---

[26]  Defendant Blaker was also from the Quality Control and Adjudication Bureau.  (Buckman Cert. Ex. 47, OL00924)

harassing enlisted members who violate the behavioral expectations of their peers." (Buckman Cert. Ex. 28)

On January 4, 2001, Oliva was transferred within Troop A from the Woodbine Station to the Tuckerton Station, thereby removing him from his alleged harassers. (Attwood Cert. Ex. T, V)  Oliva had requested a transfer to the Bass River Station, which was in Troop B,[27] but Defendant Dunbar determined that there was no reason to transfer Oliva out of Troop A. (Attwood Cert. Ex. V)  Oliva never actually reported for duty at Tuckerton Station, however. He took "stress leave" beginning January 1, 2001, and never returned to active duty. (Attwood Ex. Q, OL05498)

Even while on leave, Plaintiff asserts, the harassment of Oliva continued. On January 5, 2001, Defendant Sergeant Kenneth Schairer and Defendant John Zulawski, both from the State Police Internal Affairs Investigation Bureau (hereafter "Internal Affairs"), went to Oliva's home, purportedly in an attempt to secure the anonymous notes and other physical evidence Oliva was holding.[28] (Attwood Cert. Ex. W)  When it appeared that Oliva was not at home, and that he had not called any station to request

---

[27]  All of Oliva's previous station assignments (Belmawr, Buena Vista and Woodbine) were in Troop A.

[28]  Several previous attempts to schedule a meeting time had failed. (Attwood Cert. Ex. W)  Defendant Meddis had ordered Oliva to turn over the evidence during the December 27, 2000 interview. (Buckman Cert. Ex. 47, OL00939)  Oliva wanted to consult with his attorney before doing so. (Id.)

15

permission to leave his home,[29] Defendants Schairer and Zulawski
decided to go to Oliva's gym, in an attempt to locate him.  (Id.)
At the gym, they found Oliva in the sauna, and entered the sauna to
question him.[30]  (Id.)  After Defendants Schairer and Zulawski
informed Oliva that they believed they had an appointment with him
at his home that morning, Oliva became agitated, stating that he
believed Defendants Schairer and Zulawski were harassing him.
(Id.)  Oliva further stated that he had left a message at their
office that morning.  (Id.)  Then Oliva used his cell phone to call
his lawyer.  (Id.)

Less than three weeks later, a story entitled, "N.J. trooper:
Even now, fighting profiling costs him," appeared on the front page
of the Philadelphia Inquirer.  (Attwood Cert. Ex. Y)  The story
reported,

> John Oliva's two-year career as a New Jersey state
> trooper has, he says, already passed these landmarks:
>
> • He has been instructed by two senior troopers-- as
>   recently as February-- in profiling techniques to
>   single out motorists for stops he believes are
>   illegal.
>
> • When he objected, the supervisors gave him poor
>   performance evaluations, and a sub-rosa group of

---

[29]  The New Jersey State Police Standard Operating Procedure
C33 in effect at the time directs that "all personnel while on
sick leave or absent from duty due to illness/injury, shall be
required to remain at home during duty hours . . . except when
otherwise authorized."  (Attwood Cert. Ex. R; Buckman Cert. Ex.
33)

[30]  Oliva was not dressed at the time.  (Attwood Cert. Ex.
W)

troopers calling themselves the 'Lords of Discipline' threatened him, vandalized his gear, and he believes, initiated a rumor that discredited him.

• After complaining to supervisors and being offered help by internal affairs, he says, state police agents pursued him as if he were a culprit.

(Id.)

On May 21, 2001, while Internal Investigation 2001-01HI was ongoing, Oliva filed this lawsuit.[31]  Thereafter, Internal Affairs officers Defendant Sergeant Debra Armitage and Defendant Gayle Cameron,[32] were assigned to join the investigation.  (Attwood Cert. Exs. VV, WW)  Defendant Colonel Dunbar chose Defendant Cameron because of Defendant Cameron's previous experience investigating the alleged Lords of Discipline group.  (Attwood Cert. Ex. VV)

On December 10, 2001, Defendants Armitage and Cameron re-interviewed Oliva,[33] this time at his attorney's office.  (Buckman

_____

[31]  Three days prior to filing suit, Oliva filed a hostile work environment complaint with the State Police Equal Employment Opportunity / Affirmative Action Office.  (Attwood Cert. Ex. Z)  On May 31, 2001, that Office wrote Oliva advising him that his complaint "does not implicate the State Policy Prohibiting Discrimination, Harassment and Hostile Environments in the Workplace."  (Id.)

[32]  The Second Amended Complaint names "Gail" Cameron as a Defendant.  However, the record suggests that "Gayle" is the correct spelling.

[33]  Defendant Armitage made multiple unsuccessful attempts to schedule Oliva's interview prior to December 10, 2001.  (Attwood Cert. Ex. AA)

17

Cert. Ex. 41, OL02693)[34]  During the interview, Oliva described the racial profiling incidents involving Trooper Gallagher and Defendant Waldron, and explained why he believed those incidents were the motivation for the harassment he experienced.  (Id.)  When asked why he did not disclose the profiling incidents during his first interview, Oliva explained,

> [T]hat part was not at the forefront at the time, at the time I went to see Lt. Meddis, was when I had these guys, the Lords of Discipline clowns threatening my life and breaking into my locker and handing me anonymous notes where I couldn't go back to work.  So that was at the forefront of the, Pat Gallagher was not my, you know, I went to see him not because of Pat Gallagher. . . . But, when you have these two guys following me into the sauna in the gym in my underwear well, then, that was it.  I went out on stress leave after that episode. Well, now, you put it all together you know, and this is how it all started.

(Buckman Cert. Ex. 41, OL02737)

After Oliva's second interview, a separate internal investigation (Internal Investigation 2002-0067) was opened to investigate the profiling allegations against Trooper Gallagher. (Attwood Cert. Ex. BB)  Defendant Armitage's reason for treating Trooper Gallagher separately from the pre-existing investigation was that "Trooper Gallagher has no alleged involvement with any hazing, harassment, or anonymous notes which have been defined by Trooper Oliva as behavior indicative of the 'Lords of Discipline.'" (Id.)

---

[34]  The transcript of the interview suggests that Oliva's attorney was not present during the interview.  (Buckman Cert. Ex. 41, OL02694-2695)

18

On May 21, 2002, while Oliva was still on stress leave, Defendant Superintendent Joseph Santiago informed Oliva by letter that "I am hereby putting you on notice that I am contemplating not reappointing you to the Division of State Police upon the expiration of your present enlistment."[35]  (Attwood Cert. Ex. JJ) Defendant Santiago testified that his decision was based on the fact that Oliva had been on stress leave for an extended period of time, and the recommendation of the panel of officers who conducted the re-enlistment review of all the troopers up for re-enlistment. (Attwood Cert. Ex. LL)  Specifically, with respect to Oliva, the re-enlistment report stated,

> Tpr. Oliva did not appear before the panel.  He has been on extended sick leave.   In reviewing Tpr. Oliva's disciplinary record he has abused the sick leave policy more than once in addition to other violations.  Due to the limited amount of full duty time and continued violations, Tpr. Oliva should not be re-enlisted.

(Attwood Cert. Ex. FFF)

In July, 2002, Defendant Meddis wrote to Oliva to inform him that the first internal investigation, 2001-001HI, had been completed.  (Attwood Cert. Ex. AAA)  The letter reported that Oliva's allegations were unsubstantiated, except that "the investigation partially substantiated [the] allegation against

---

[35]  The Collective Bargaining agreement between the State of New Jersey and the State Troopers Fraternal Association requires such written notice.  (Attwood Cert. Ex. KK)

Sergeant Edward M. Sokorai[36]. . . . However, Sergeant Sokorai retired prior to the implementation of discipline."  (Id.)

As the Gallagher internal investigation (investigation number 2002-0067) progressed throughout 2002, Defendant Armitage identified and interviewed several motorists who were stopped by Trooper Gallagher and Oliva during the Trooper Coach period. (Attwood Cert. Ex. EE)  According to Defendant Armitage, by July, 2002, "four motorists [had] provided taped statements which suggest[ed] Trooper Oliva [was] more culpable than Trooper Gallagher.  Two of these four motorists submitted to polygraph testing and were found to be truthful."[37]  (Attwood Cert. Ex. GG) Based on this information, Defendant Armitage formally requested that Oliva be designated a principal (i.e., target) in the Gallagher internal investigation.  (Id.)  On August 18, 2002, Oliva was formally notified by letter that his status in the investigation had been changed from complainant to principal. (Id.)

Approximately a month later, on September 17, 2002,[38] Oliva

---

[36]  Though not entirely clear, the record suggests that the investigation revealed Defendant Sokorai to be the person who vandalized Oliva's locker.  (Buckman Cert. Ex. 24, OL01934)

[37]  Defendant Armitage attempted to perform polygraph examinations of all four motorists but only two ultimately cooperated.  (Attwood Cert Ex. FF)

[38]  The interview transcript notes a correction that the interview was conducted on September 17, 2002, not September 15, 2000, as the cover page indicates. (Buckman Cert. Ex. 41, NJSP590)

was interviewed for a third and final time, as a principal in the Gallagher investigation.  (Buckman Cert. Ex. 41, NJSP529-590)  The interview took place in a conference room at State Police Division Headquarters in Trenton, New Jersey.  (Id., NJSP529) Because Oliva was a principal, his "Weingarten Representative"[39] was present at the interview.  (Id.)

It appears from the record that the Gallagher Internal Investigation was completed the following day (September 18, 2002), with Defendant Armitage issuing a completed internal investigation report.  (Attwood Cert. Exs. EEE; HHH)  Defendant Armitage found the racial profiling allegations against Gallagher to be "unsubstantiated."  (Attwood Cert. Ex. EEE)  However, Defendant Armitage found "substantiated" by a "preponderance of the evidence" Oliva's other allegations-- that Gallagher instructed him to falsify police reports and failed to properly train and supervise him. (Id.)

As to the allegations that Oliva created false police reports, and provided false information during his December 10, 2001 interview, Defendant Armitage concluded the allegations were "substantiated" by a "preponderance of the evidence."  (Attwood Cert. Ex. EEE)  Specifically, Defendant Armitage found that Oliva had, in fact, conducted searches of motorists' vehicles, despite

---

[39]  It appears that a Weingarten Representative is a union representative who is assigned to represent the principal trooper's interests.  (Attwood Cert. Ex. ZZ)

his "adamant" assertions to the contrary during the December 10, 2001 interview. (Id.)

On September 19, 2002, the day after Defendant Armitage completed the Gallagher Internal Investigation, Lieutenant Thomas Flarity sent the following email to Major Joseph Brennan[40]:

> Major you recently forwarded a completed internal investigation report transmittal related to the above captioned matter [Hearings Pending for Tpr. Gallagher and Tpr. Oliva in OPS case number 02-67] for the Supt.'s[41] review/decision/offer.  The following is a verbatim directive from the Supt.: Schedule GDH[42] for both. . . . Offer <u>resignation</u> to both.  Oliva, who can be terminated as part of "enlistment" failures as well as this case.  <u>If</u> he testifies against Gallagher . . . [ellipsis in original] Gallagher: Offer resignation; if not, GDH; profiling is profiling whether black or white[.]

(Attwood Cert. Ex. HHH)(underlines in original)  It is undisputed that news of Defendant Superintendent Santiago's decision never reached Oliva.  Less than two weeks after the email was sent, Oliva

---

[40]   Major Brennan was Defendant Armitage's superior. (Attwood Cert. Ex. WW)  He received briefings from Defendants Armitage and Cameron during the course of the Gallagher investigation. (Attwood Cert. Ex. ZZ)

[41]   "Supt." refers to Defendant Superintendent Santiago.  He testified, "I wrote a note . . . or a memo [was] generated that essentially directed IA to confer with Oliva and offer him resignation instead of termination if he agreed to testify against [Gallagher]."  (Attwood Cert. Ex. LL)  Lieutenant Thomas Flarity was the "Superintendent's representative."  (Attwood Cert. Ex. ZZ)

[42]   "GDH" apparently stands for "general disciplinary hearing."  (Attwood Cert. Ex. ZZ)

committed suicide.[43]

Oliva's medical records demonstrate that immediately after taking stress leave, Oliva sought psychological help because of the harassment he experienced at work.  (Buckman Cert Ex. 31)  He kept regular appointments with a private psychologist in order to address his anxiety about returning to work, and the symptoms-- hypervigilance, nightmares, and lack of sleep-- that he experienced as a result.[44]  (Id.)  His anxiety and distress worsened throughout his stress leave, particularly after he received Defendant Santiago's letter advising him that he might not be re-enlisted.[45] (Id.)

On May 9, 2001, Oliva's treating psychologist, Dr. Ange Puig, wrote to the State Police Medical Office to report that Oliva had been in treatment since January 9, 2001, and continued to require treatment.  (Buckman Cert. Ex. 31)  The letter described Oliva's symptoms, and then concluded, "[i]n my opinion as the current

---

[43]  Trooper Gallagher's "Summary Disciplinary Hearing" was held on January 14, 2004.  (Buckman Cert. Ex. 9)  On May 6, 2004, the hearing officer found Trooper Gallagher guilty of "knowingly making false or misleading official reports" and of "performing in a culpably inefficient manner."  (Id.)  The hearing officer recommended that Trooper Gallagher be suspended for 30 days. (Id.)

[44]  Oliva's initial diagnosis was "Adjustment Reaction not otherwise specified, and post-traumatic stress symptoms." (Buckman Cert. Ex. 31)

[45]  By August, 2001, Oliva was diagnosed with major depression and post-traumatic stress disorder, and was taking prescription medication for depression.  (Buckman Cert. Ex. 31)

treating psychologist, this individual should not return to duty. No reasonable time frame can be projected for a future date to return to work at this time." (Id.)  Almost identical letters were sent from Dr. Puig to the State Police Medical Services Unit on September 4, 2001; December 27, 2001; March 6, 2002; May 22, 2002; June 17, 2002; August 22, 2002; and September 17, 2002. (Id.)

According to Plaintiff, despite Oliva's deteriorating mental health, and Dr. Puig's recommendation that he not return to work, State Police medical personnel pressured Oliva to return to active duty.  On August 3, 2001, Oliva attended a meeting with Defendant Dr. Donald Izzi[46] and Defendant Lieutenant Robert Kilmurray, of the Medical Services Unit, where Dr. Izzi reviewed the results of an independent psychological evaluation of Oliva which had been conducted several months earlier in connection with his stress leave.  (Attwood Cert. Ex. OO)  Based on the results of the independent evaluation,[47] Defendant Dr. Izzi recommended Oliva return to full duty, despite having knowledge of Dr. Puig's recommendation and another recommendation from Dr. Joel Glass.[48]

---

[46]  Dr. Izzi is a civilian member of the State Police. (Attwood Cert. Ex. QQ)  The Second Amended Complaint names Dr. Donald "Izzy" but the record indicates the proper spelling is Izzi.

[47]  Dr. Izzi testified that the independent evaluator concluded that Oliva was depressed and anxious but that those conditions "[were] not contributing to the ability for him to go back to work."  (Buckman Cert. Ex. 38)

[48]  On January 2, 2001, Dr. Joel Glass wrote Oliva's attorney a brief five sentence letter stating that "[i]t

(Id.; Buckman Cert. Ex. 39)   Shortly thereafter, Oliva received a
letter ordering him to report for duty at Tuckerton Station, at 9
a.m. on August 13, 2001.  (Attwood Cert Ex. PP)

However, on August 8, 2001, Oliva met with "troop physician"
Dr. Robert Carty, for a duty examination prior to returning to
work.  (Attwood Cert. Ex. PP)  Dr. Carty concluded that Oliva
should remain on leave, although it appears from the record that at
the time, he was unaware of Dr. Izzi's recommendation to the
contrary or the order directing Oliva to report for duty.  (Id.)
Ultimately, Dr. Izzi and Dr. Carty consulted with each other, and
it was determined that Oliva should remain on stress leave.
(Attwood Cert. Ex. QQ)  On September 28, 2001, Dr. Izzi sent Oliva
a letter informing him that Oliva would be allowed to continue "in
an [sic] temporary off duty capacity."  (Attwood Cert. Ex. RR)

Oliva continued to see Dr. Carty on a regular basis for the
rest of 2001, and throughout the first eight months of 2002.
(Attwood Cert Ex. Q)  By August, 2002, Oliva was telling all of his
doctors that he was ready to return to work.[49]  Despite Oliva's

---

continues to be a danger for Mr. Oliva and his co-workers for him
to attempt to return to work at this time."  (Buckman Cert. Ex.
32) Dr. Izzi was apparently aware of this recommendation.
(Buckman Cert. Ex. 38)

[49]  Notably, Oliva told Dr. Carty on August 28, 2002, that
he was ready to go back to work (Attwood Cert. Ex. Q), which was
right around the time that Oliva's status in the Gallagher
internal investigation was changed from complainant to principal
(Attwood Cert. Ex. GG).  The record does not indicate whether
Oliva was aware of this change when he said he said he wanted to
return to work.

statements, Dr. Puig did not believe Oliva was fit to return to
duty and advised the State Police of his opinion.  (Buckman Cert.
Ex. 31)  On September 24, 2002, Defendant Dr. Izzi wrote to Oliva
notifying him that another independent evaluation had been
scheduled "in order to make a proper medical determination of your
current duty status."  (Attwood Cert Ex. UU) Oliva's appointment
was scheduled for October 15, 2002 (Id.), however, Oliva took his
life on October 1, 2002.

The 38-page Second Amended Complaint originally asserted 16
claims against all 23 individual Defendants and the State of New
Jersey.  The following claims remain at this time[50]: Conscientious
Employee Protection Act ("CEPA") claim under New Jersey law,
N.J.S.A. 34:19-1 et. seq. (Count 1); Law Against Discrimination
("LAD") claim under New Jersey law, N.J.S.A. 10-5:1 et. seq. (Count
9); and claims pursuant to 42 U.S.C. §§ 1981, 1983, 1985(3), and
1986 (Counts 5-8 and 16).[51]  As to the Section 1983 claim,
Plaintiff alleges that "defendants" "deprived [Oliva] of his
liberty and property without due process of law in violation of his
substantive due process and procedural due process rights under the

_____

[50]  Many of the claims were previously dismissed upon
Defendants' motion.  *See* Order of May 28, 2002.

[51]  Counts 3 and 4 generically assert claims for "race
discrimination" and "racial harassment," respectively.  The Court
previously dismissed these claims to the extent they were based
on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e,
et seq.  *See* Order of May 28, 2002.  To the extent the claims
remain at this time, the Court treats them as encompassed by the
other remaining claims.

Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution."  (Second Amend. Compl. ¶ 145)  Notably, Plaintiff has never pled a First Amendment violation.

In addition to the State of New Jersey[52], the following individual Defendants remain at this time: John Farmer, Jr., Attorney General of New Jersey, in his individual capacity only; State Police Superintendent Colonel Carson Dunbar, in his individual capacity only; Sergeant Bruce Meyers; Trooper Albert Waldron; Sergeant Ray Lupu; Lieutenant George Gilman; Sergeant Gary Austin; Lieutenant Horace MacFarland; Sergeant Frances Donlan; Lieutenant William Meddis; Sergeant Kenneth Schairer; Sergeant John Zulawski; Sergeant Edward Sokorai; Major Glen Miller; John Hagerty; Sergeant Robin Blaker; Lieutenant Robert Kilmurray; Dr. Donald Izzi; former State Police Superintendent Joseph Santiago in his individual capacity only[53]; Captain Gayle Cameron; and Sergeant Debra Armitage.

All Defendants move for summary judgment on all remaining claims.  For the reasons that follow the Motion will be granted in its entirety, except that the Motion will be denied as to the § 1981 and CEPA claims asserted against Defendant Waldron.

---

[52]   New Jersey remains a Defendant insofar as Plaintiff seeks injunctive relief.

[53]   Second Amend. Compl. ¶¶ 23, 27.

## II.

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted if "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See also, Anderson V. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Allegheny Pennsylvania,* 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material only if it will affect the outcome of a lawsuit under the applicable law, and a dispute of a material fact is genuine if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party. *See Anderson,* 477 U.S. at 252.

Only evidence that would be admissible at trial may be considered when deciding a summary judgment motion. *See Blackburn v. United Parcel Service, Inc.*, 179 F.3d 81 (3d Cir. 1999)(noting that hearsay statements that are inadmissible at trial should not be considered when determining whether the nonmoving party has established a triable issue of fact).

### III.

The Court addresses Plaintiff's claims in the following order: (A) § 1981 retaliation claim; (B) conspiracy claims under §§ 1985(3) and 1986; (C) § 1983 claims; (D) CEPA & LAD claims; (E) purported claims pursuant to N.J.S.A. 10:6-2 and the New Jersey State Constitution; (F) remaining claims against the State of New Jersey.

### A.

Plaintiff asserts that Defendants retaliated against Oliva by harassing him and otherwise creating a hostile work environment, because of Oliva's complaints of racial profiling of motorists, in violation of 42 U.S.C. § 1981.  Section 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> (b) 'Make and enforce contracts' defined. For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
>
> (c) Protection against impairment. The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.

To establish a prima facie case of retaliation Plaintiff must put forth sufficient facts to demonstrate: (1) engagement in protected activity; (2) the employer took adverse employment action against the protected employee; and (3) a causal connection between (1) and (2). *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006).[54] Creation of a hostile work environment can, as a matter of law, constitute adverse employment action in a retaliation suit, if the hostile environment "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 64 (2006).[55]

If a plaintiff successfully establishes a prima facie case, the burden shifts to the employer to demonstrate a legitimate, non-retaliatory reason for its conduct. *Moore*, 461 F.3d at 342. If the employer puts forth a non-retaliatory reason, the burden then shifts back to the plaintiff to show that the proffered reason was

---

[54] Although *Moore* is a Title VII retaliation case, the same standard applies in § 1981 retaliation cases. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387 (11th Cir. 2007), *affirmed by CBOCS West, Inc. v. Humphries*, 128 S.Ct. 1951 (2008).

[55] It is not clear whether Plaintiff asserts a separate hostile work environment claim independent of the retaliation claim. Even if such a claim were asserted, it would fail as Plaintiff does not allege that Oliva was discriminated against on the basis of his own race. *See Burlington Northern*, 548 U.S. at 63 (explaining the distinction between the anti-discrimination and anti-retaliation provisions of Title VII: "The substantive provision seeks to prevent injury to individuals based on who they are, i.e., their status. The antiretaliation provision seeks to prevent harm to individuals based on what they do, i.e., their conduct.").

pretextual.  *Id.*


Protected activity

     Defendants argue that Plaintiff cannot, as a matter of law,
establish the first element of the prima facie case because Oliva
was white, he allegedly complained about intentional racial
discrimination directed at others (not himself), and those people
on whose behalf he complained were "undefined and unidentified."

     After this Motion was fully briefed, the Supreme Court decided
*CBOCS West, Inc. v. Humphries*, 128 S.Ct. 1951 (2008), which
provides substantial guidance on the issue presented.  *Humphries*
held that § 1981 "encompasses a complaint of retaliation against a
person who has complained about a violation of another person's
contract-related 'right.'" 128 S.Ct. at 1954.  At issue was
Humphries' claim that he was fired because he complained to
management when one of his co-workers was fired, allegedly for
"race-based reasons."  *Id.*  The Court concluded that Humphries, who
"suffer[ed] retaliation because he . . . tried to help a different
individual, suffering from direct discrimination, secure [her] §
1981 rights," had a viable cause of action.  *Id.* at 1958.

     In coming to that conclusion, the Court heavily relied upon
*Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229 (1969), which
held that 42 U.S.C. § 1982 encompassed retaliation claims of
plaintiffs who tried "'to vindicate the rights of minorities
protected by § 1982.'" *Humphries*, 128 S.Ct. at 1955 (quoting

31

*Sullivan*).  Stated another way, "[i]n *Sullivan* [the Court] interpreted a general prohibition on racial discrimination in § 1982 to cover retaliation against those who advocate the rights of groups protected by that prohibition."  *Id.*

Thus, *Humphries* counsels that, in determining whether a plaintiff is protected under the statute (i.e., whether he suffered discrimination because of race), the court must inquire whether the alleged victims of racial discrimination-- i.e., those for whom the plaintiff has advocated-- would have a valid cause of action for direct discrimination under § 1981.[56]

To state a claim for direct discrimination under § 1981, a plaintiff must show (1) discrimination based on race; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in § 1981.  *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 283 (1976); *Pryor v. NCAA*, 288 F.3d 548, 569 (3d Cir. 2002).  A reasonable factfinder could conclude on this record that the

---

[56]  *Humphries* did not address the issue of whether a § 1981 retaliation claim may be based on an objectively reasonable, honestly held, but ultimately erroneous belief that a violation of § 1981 had occurred.  *Cf. Moore*, 461 F.3d at 341 ("the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII.")(citing *Clark County v. Breeden*, 532 U.S. 268 (2001)).  As discussed *infra*, this Court need not decide the issue because the record evidence could support a finding that § 1981 was actually violated in this case.

motorists were singled-out on the basis of their race[57] and that Troopers Gallagher and Waldron had an intent to discriminate. Accordingly, the question becomes: did the alleged illegal stops impede one or more of the activities enumerated in § 1981?

Clearly the motorists had no contract with the troopers; nor do these facts implicate the "right to sue, be parties, [and] give evidence." 42 U.S.C. § 1981(a). However, a reasonable factfinder could conclude that the motorists were denied the "full and equal benefit of all laws" through the selective enforcement of the law. *Id.*

In construing § 1981's "equal benefit" and "like punishment" clauses, the Third Circuit, in *Mahone v. Waddle,* held that the Plaintiffs had stated a cause of action under both:

> Plaintiffs have alleged that the City [of Pittsburgh's] police officers, clothed with the authority of the City and the state and motivated by racial bias, verbally and physically abused them, falsely arrested them, and gave false testimony against them. It seems to us that plaintiffs have in effect alleged that because they are black they were subjected to officially inflicted 'punishment, pains, [and] penalties' other than those to which white persons are subject. *In alleging that because of their race they were arrested without probable cause or warrant and that they were convicted by false testimony of crimes they did not commit, plaintiffs have in effect charged that the City's officers denied them the same 'full and equal benefit of . . . laws and proceedings for the security of persons . . . as is enjoyed by white persons.'* We therefore believe that the facts alleged fall within the broad language of both the equal benefits and like punishment clauses of section 1981.

---

[57]   *McDonald* makes clear that even singling out white motorists is actionable under § 1981.  427 U.S. at 283.

564 F.2d 1018, 1028 (3d Cir. 1977)(emphasis added), *cert. denied,* 438 U.S. 904 (1978).

Here, a reasonable factfinder could conclude that motorists were stopped without probable cause because of their race, searched, and in some cases, arrested.  Thus, the motorists would have a valid claim under § 1981 and *Mahone*.  *See also, Hall v. Pa. State Police*, 570 F.2d 86 (3d Cir. 1978)(holding that a black bank customer had a valid § 1981 claim where police and bank officials targeted black bank customers for surveillance); *see generally, Alexis v. McDonald's Rest.,* 67 F.3d 341, 348 (1st Cir. 1995) ("a misuse of governmental power motivated by racial animus comes squarely within the 'equal benefit' and 'like punishment' clauses of section 1981(a).")(citing *Mahone*).

Having thus determined that a reasonable factfinder could conclude that Oliva complained about practices that violate others' rights protected by § 1981 (thereby engaging in protected activity forming the foundation for his own § 1981 retaliation claim), the Court turns to Defendants' other arguments in support of their Motion for Summary Judgment.

First, Defendants argue that the § 1981 claim fails because Oliva was not a racial minority.  *Humphries'* reliance on *Sullivan* severely undercuts this argument.  The plaintiff who allegedly suffered retaliation in *Sullivan* was white, as *Humphries* indicates. *Humphries,* 128 S.Ct. at 1955.  While it is true that Humphries was a black man, that fact does not appear to have significance in the

34

Court's § 1981 retaliation analysis.  Indeed, Humphries' race is only mentioned once in the opinion-- in parentheses with regard to his direct racial bias claim that was not before the Court.  *See Humphries*, 128 S.Ct. at 1954.  "[T]he [Supreme] Court has construed §§ 1981 and 1982 alike because it has recognized the sister statutes' common language, origin, and purposes."  *Id.* at 1956.  Since *Sullivan* allows white plaintiffs to sue for retaliation under § 1982, this Court must conclude that white plaintiffs may sue for retaliation under § 1981.[58]

---

[58]  *See also, Aleman v. Chugach Support Servs., Inc.,* 485 F.3d 206, 214 (4th Cir. 2007)(holding that § 1981 "plaintiffs . . . can challenge as discriminatory actions that were taken against them for reporting unlawful discrimination, even if the plaintiffs were not subject to discrimination based upon their own race, gender, or similar protected status." (citing *Sullivan*); *Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 575 (6th Cir. 2000)("it is clear that Caucasian high-level affirmative action official could bring a claim under § 1981 . . . for discrimination based upon his advocacy on behalf of women and minorities because the discrimination would be 'because of such individual's race,' where the race of the minorities for which he was advocating would be 'imputed' if you will to the Caucasian high-level affirmative action official."); *cf. Moore*, 461 F.3d at 342 ("Title VII's whistle-blower protection is not limited to those who blow the whistle on their own mistreatment or on the mistreatment of their own race, sex, or other protected class.").
    In a similar argument, Defendants argue that the cause of action must fail because Oliva, as a new trooper, was in a probationary position, and therefore had no enforceable employment contract.  This argument is without merit.  Even at-will employees have "contract" rights sufficient to maintain a cause of action under § 1981.  *See Walker v. Abbott Labs.*, 340 F.3d 471, 475 (7th Cir. 2003); *McClease v. R.R. Donnelley & Sons Co.*, 226 F. Supp. 2d 695, 701 (E.D. Pa. 2002)("Every appellate court that has examined the legislative history of the 1991 statute has concluded that Congress intended the term 'contract' to encompass at-will employment.").  Assuming without deciding that Oliva himself must have an independent protectable right under § 1981 (a highly questionable proposition given the

Second, Defendants argue that the § 1981 claim must fail because the motorists for whom Oliva advocated were "undefined and unidentified," and not known to Oliva.  Presumably, Defendants would contrast this case with *Humphries* and *Sullivan* in that regard.[59]  In both of those cases the plaintiffs knew the third party who was the alleged target of race discrimination: in *Humphries* the third party was a co-worker; in *Sullivan* the third party was the plaintiff's lessee and assignee.  However, the Court disagrees that a § 1981 retaliation claim necessarily must be so limited.

In *Johnson v. University of Cincinnati,* the plaintiff, a high-level affirmative action officer at the University of Cincinnati, asserted a claim for retaliation under § 1981, alleging that he was terminated "'because of [his] support of affirmative action *policies* and minority hires.'" 215 F.3d 561, 576 (6th Cir. 2000)(emphasis added).[60]  Specifically, plaintiff allegedly made "efforts to advocate for the A-900 *process*," which was a system for reviewing open positions in an effort to fill them with minority or women candidates.  *Id.* at 575 (emphasis added).

Specifically addressing the dissent's objection that a § 1981

---

reasoning of *Aleman, Johnson* and *Moore*), the mere fact of his employment by the State of New Jersey suffices to establish a contract right protected by § 1981.

[59]  As noted *supra*, *Humphries* was decided after briefing was completed in this case.

[60]  *Rehearing en banc denied*.

36

claim could not be founded upon "general advocacy of minority
rights," the majority relied on *Sullivan* and explained that if the
harm alleged was to go unredressed, "it would give impetus to the
perpetuation of racial and minority discrimination . . . which . .
. § 1981 [was] designed to prevent." *Johnson,* 215 F.3d at 576.
The majority concluded, "when the action undertaken by the official
is the advocacy of hiring practices that do not discriminate on the
basis of race . . . the advocacy can indeed be considered protected
conduct under § 1981, and a jury should decide whether a defendant
employer has discriminated or retaliated against the high-level
affirmative action official for this advocacy." *Id.* at 578.

       Although not specifically characterized as such, by objecting
to racial profiling, a factfinder could conclude that Oliva was
essentially advocating a "policy" of nondiscrimination similar to
the plaintiff in *Johnson*.  A reasonable jury could find that he
complained that motorists were being racially profiled and refused
to participate in such activity.

       Moreover, contrary to Defendants' assertions, a reasonable
jury could also find that the people on whose behalf Oliva
advocated were not completely unidentified or unidentifiable.  It
is undisputed that police reports were created documenting the
motorists who were stopped, at least during Oliva's training with
Trooper Gallagher.  Indeed, the internal investigation into Trooper
Gallagher's actions did identify some of the motorists who were
allegedly stopped without probable cause on the basis of their

37

race.  In this respect, even if Defendants' argument otherwise had
merit, it is based on a premise that is not supported by the
record.  A reasonable jury could find that Oliva advocated for the
people he personally witnessed being illegally stopped.

To summarize, the Court concludes that if a jury finds that
Oliva did indeed advocate for the rights of motorists who were
illegally stopped on the basis of their race-- by complaining to
his supervisors and refusing to engage in such activities himself--
Plaintiff will have satisfied the first element of its § 1981
retaliation claim.

Adverse employment action; causal connection; and pretext

Under the last two prongs of the prima facie case, the Court
must determine: whether "materially adverse actions" were taken
against Oliva; by which Defendants; and whether a reasonable
factfinder could find a causal connection between Oliva's protected
activity and the adverse actions (i.e., evidence of retaliatory
animus).  *Moore*, 461 F.3d at 346.  Then, if Defendants put forth a
legitimate, non-retaliatory reason for the adverse action,
Plaintiff must demonstrate that reason is pretextual.  *Id.*

An employer's actions that "'well might have dissuaded a
reasonable worker from making or supporting a charge of
discrimination" are materially adverse.  *Moore*, 461 F.3d at 346.

> In evaluating whether actions are materially adverse,
> [the Court] must remain mindful that it is important
> to separate significant from trivial harms because an

```
employee's decision to report discriminatory behavior
cannot immunize that employee from those petty slights
or minor annoyances that often take place at work and
that all employees experience.  Furthermore, [the
Court] must identify what materially adverse actions a
reasonable jury could link to a retaliatory animus.
```

*Id.*

In its opposition brief, Plaintiff identifies 15 individual defendants who allegedly took retaliatory actions against Oliva. Before turning to the record evidence with regard to each defendant, it is helpful to examine the evidence as to the timing and location of Oliva's alleged protected conduct, as that evidence is essential to connecting alleged materially adverse actions to each defendant and to retaliatory animus.  The following time-line is revealed by the record:

- November, 1998– While working at Bellmawr Station, Oliva complains to Sergeant Gordillo about Trooper Gallagher's alleged profiling practices

- April, 2000– While working at Buena Vista Station, Oliva objects to Defendant Waldron indicating he would not engage in racial profiling

- May, 2000– While working at Woodbine Station, Oliva tells Sergeant Callen about racial profiling he witnessed and complained about[61]

---

[61] As to the first three events (November, 1998; April, 2000; and May, 2000), Defendants argue that the sole evidence in the record to establish that they occurred are the transcripts of Oliva's statements given to internal investigators, which Defendants assert are inadmissible hearsay themselves, and contain hearsay statements.  A review of the transcripts indicates that the transcripts might be admissible under Fed. R. Evid. 804(b)(1) (when relied upon by Plaintiff) and 801(2) (when relied upon by Defendants).  With respect to admissibility under 804(b)(1), which refers to "former testimony," the Court notes that in the December, 2001 interview and the September, 2002

- January 23, 2001– The Philadelphia Inquirer story is published

- May 11, 2001– Oliva files the original complaint in this action alleging that he suffered acts of retaliation for making complaints about the racial profiling of Trooper Gallagher and Defendant Waldron

*Defendant Sokorai*

The first allegedly adverse employment actions taken against Oliva involve Defendant Sergeant Sokorai, Oliva's supervisor at the Woodbine Station.[62]  The record indicates that during Oliva's first

interview, Oliva was advised that State Police regulations required him to speak truthfully and at the end of the interviews he signed and dated each cassette tape which recorded the interview, "in order to attest to the fact that [his] statement is an accurate, complete, and truthful account of [the facts]." (Buckman Ex. 41)

The Court need not definitively rule on the issue, however, because as demonstrated *infra*, such a ruling would not alter the outcome in this case.  Even assuming the admissibility of the transcripts, all Defendants except Waldron are entitled to summary judgment.  As to Defendant Waldron, there is sufficient evidence in the record apart from Oliva's interview statements (namely, Defendant Waldron's own deposition testimony) upon which a reasonable factfinder could conclude that Oliva complained to Defendant Waldron about alleged profiling practices.

[62]  Oliva reported that salt was placed in his locker while stationed at Bellmawr, but there is no evidence in the record to identify who was involved in that incident.

Similarly, Plaintiff briefly argues that Oliva's transfer from Bellmawr Station to Woodbine was retaliatory, but does not explain why.  There is no evidence in the record that the transfer occurred under unusual circumstances.  To the contrary, Defendants submit evidence demonstrating that it was the general practice of the State Police to assign Trooper recruits to two stations for approximately six months each, after completing the Trooper Coach program. (Cert. of Captain Louis Klock, ¶¶ 2-4) Nor does the record show that the transfer created any sort of hardship for Oliva.  Moreover, Plaintiff does not identify who made the decision to transfer Oliva.

period at Woodbine Station (mid-1999 to early 2000) Defendant

Sokorai issued Oliva two negative performance notices-- one in

August, 1999, and another in November, 1999.  According to Oliva,

the notices were unwarranted.

Assuming that the negative performance notices could dissuade

a reasonable worker from making a charge of discrimination, a

reasonable factfinder could not find the requisite retaliatory

animus on this record.  At the time the notices were issued, the

only complaint Oliva had made was to Sergeant Gordillo, at the

Bellmawr Station, in November, 1998.  Although Oliva believed that

news of his complaint spread to Woodbine Station, there is no

evidence in the record to support that contention.  There is no

evidence of any communications between anyone at Bellmawr Station

and Woodbine Station as to any matter, much less Oliva's complaint

in particular.  Nothing in the record supports an inference that

Defendant Sokorai knew or could have known of Oliva's complaint[63]

when he issued the performance notices.[64]  Moreover, approximately

nine months elapsed between Oliva's complaint and first negative

performance evaluation.  These facts do not support an inference of

---

[63]  Plaintiff's vague assertions that "everyone" knew that
Oliva complained are insufficient to create a triable issue of
fact.

[64]  Likewise, while there is evidence that Defendant Sokorai
was the person who vandalized Oliva's locker during Oliva's
second period at Woodbine Station, there is no evidence in the
record that Sokorai knew of Oliva's complaints to Defendant
Waldron while Oliva was stationed at Buena Vista.

retaliation.  Summary judgment will be granted to Defendant Sokorai
on the § 1981 claim.


*Defendant Meyers*

     Next, Plaintiff points to Defendant Meyers' delivery of the
first anonymous note to Oliva in November, 1999, while Oliva was
still stationed at Woodbine.  Again, assuming that such action
would dissuade a reasonable worker from making a charge of
discrimination, a reasonable factfinder could not find the
requisite retaliatory animus on such facts.  For the reasons
already explained, nothing in the record supports even an inference
that anyone at Bellmawr Station communicated the fact of Oliva's
complaint to anyone at Woodbine Station.  Without some evidence to
show that Defendant Meyers knew or could have known of Oliva's
complaint, there can be no link between the adverse action and
retaliatory motive.  Additionally, the anonymous note was delivered
almost a year after Oliva made his complaint.  Such facts cannot
support an inference of retaliation.  Summary judgment will be
granted to Defendant Meyers on the § 1981 claim.


*Defendant Miller*

     In early 2000, Oliva was transferred to Buena Vista Station.
Defendant Miller, the Troop A Commander at the time, was the person
who made the transfer decision.  According to Plaintiff, the
transfer was a form of retaliation because Oliva's commute to the

42

Buena Vista Station was longer.

First, Defendants submit maps retrieved from the internet showing that the Buena Vista Station was only 4.25 miles farther from Oliva's home than the Woodbine Station.[65]  (Attwood Cert. Ex. CCC).  Such a small increase in commute, without some other evidence of hardship to Oliva, is merely a "trivial harm" that is not actionable.  *Moore*, 461 F.3d at 346.

Second, there is no evidence in the record that Defendant Miller knew or could have known about Oliva's complaint to Sergeant Gordillo.  Therefore there can be no inference of retaliatory motive.

Third, Defendants' non-retaliatory reason for the transfer has not been rebutted by Plaintiff.  Defendant Miller states in his certification that Oliva's transfer resulted from the transfer of other troopers among stations so that those troopers could be closer to home.  (Miller Cert. ¶ 6)  Defendant Miller explained that he chose to transfer Oliva, resulting in a 4.25 mile increase in his commute, so that another trooper would have a commute that was 50-60 miles shorter.  Plaintiff has demonstrated no incoherencies, inconsistencies or other anomalies which cast doubt on this explanation.

Summary judgment will be granted to Defendant Miller as to the § 1981 claim.

---

[65]  Buena Vista Station was 35.48 miles from Oliva's home. Woodbine Station was 31.23 miles away. (Attwood Cert. Ex. CCC)

43

*Defendant Waldron*

Once stationed at Buena Vista, Oliva told Defendant Waldron that he believed Waldron was racially profiling.  Oliva refused to engage in such practices.  According to Oliva, Waldron became upset and raised his voice.  Then, a week later, Waldron issued a negative performance evaluation of Oliva.  A reasonable factfinder could conclude that the evaluation was unwarranted because Sergeant Callen ordered the creation of a new evaluation that was more positive.

Such evidence, viewed in the light most favorable to Plaintiff, could support a finding that a reasonable worker would be dissuaded from making a charge of discrimination.  An unwarranted negative evaluation by one's supervisor could have a deterrent effect.

A reasonable factfinder could also find retaliatory animus. Unlike Plaintiff's claims against Defendants Sokorai, Meyers and Miller, Defendant Waldron allegedly knew of Oliva's complaint and refusal to engage in profiling (because Oliva objected directly to Waldron), and became upset as a result of the conversation.  There was also a short lapse of time (one week) between Oliva's conversation with Waldron and the baseless negative performance evaluation.

Defendants have not put forth a legitimate, non-retaliatory

44

reason for the negative evaluation,[66] and in any event, the
undisputed facts that: (a) Oliva was successful in proving the
evaluation to be unfounded, and (b) Waldron was ordered to create a
new evaluation, could support a finding of pretext.  Accordingly,
summary judgment will be denied as to the § 1981 claim against
Waldron.


*Defendants Austin and MacFarland*

      In September, 2000, while stationed at Woodbine Station for
a second time, Oliva asserts that Defendants Austin and MacFarland
retaliated against him by accusing him, in a very confrontational
manner, of making anonymous negative comments on the internet about
another trooper.[67]  According to Oliva, Austin and MacFarland
"interrogated" him for an hour, despite Oliva's repeated denials
that he authored the posting.

      The Court has serious doubts whether such actions can be
considered "materially adverse" as a matter of law.  However, even
assuming that such facts are sufficient, the record does not
support and inference of retaliatory motive.  Nothing in the record
demonstrates that either Austin or MacFarland knew or could have

---

[66]  As noted previously, Defendant Waldron is represented by
separate counsel and did not submit his own brief in support of
the instant motion.  If Defendant Waldron had a legitimate, non-
retaliatory reason for the initial evaluation, the Court is not
aware of it.

[67]  The anonymous comments had nothing to do with either
Oliva's complaints or racial profiling.

known about any of Oliva's previous complaints, as those complaints all took place at stations other than Woodbine Station.  There is no evidence in the record upon which a reasonable factfinder could conclude that either Austin or MacFarland had communications with either Sergeant Gordillo, Defendant Waldron, or Sergeant Callen-- the only people, according to the record, who knew of Oliva's complaints at the time this incident occurred.

Summary judgment will be granted to Defendants Austin and MacFarland on the § 1981 claim.


*Defendant Lupu*

It is undisputed that Defendant Lupu, Sergeant at the Woodbine Station, issued three negative performance notices to Oliva during October, 2000.  With respect to the October 2, and October 10 notices, however, there is no evidence in the record, nor does Plaintiff argue, that those notices were unwarranted.  The third notice, issued on October 12, stated that Oliva had failed to get the appropriate amount of rest before reporting for duty.  Oliva denied that he had been sleeping on the job.

Assuming without deciding that these actions, taken together, could amount to "materially adverse action," Plaintiff cannot demonstrate the requisite retaliatory intent.  For the same reasons explained above as to Defendants Austin and MacFarland, nothing in the record indicates that Defendant Lupu knew or could have known

about Oliva's prior actions at different stations.[68]

Summary judgment will be granted to Defendant Lupu on the §
1981 claim.

*Defendant Dunbar*

Next, Plaintiff asserts that Oliva's transfer from Woodbine
Station to Tuckerton Station was retaliatory.  After Oliva's first
interview on December 27, 2000, Defendant Dunbar decided to
transfer Oliva out of Woodbine Station, which is where Oliva
received all three anonymous notes.[69]  Plaintiff does not take
issue with the mere decision to transfer; indeed Plaintiff asserts
that a transfer was necessary.  Plaintiff argues however, that
Defendant Dunbar's decision to transfer Oliva to Tuckerton Station
was retaliatory because Tuckerton Station is within Troop A.
According to Plaintiff, Dunbar should have transferred Oliva to
Bass River Station, which is in Troop B.

Plaintiff argues that the decision to send Oliva to  Tuckerton
Station was materially adverse because Tuckerton Station was a "bed
of Lords of Discipline activity."  Plaintiff apparently suggests

---

[68]   In one sentence, without any citation to the record,
Plaintiff asserts that "Lupu and MacFarland were well aware that
[Oliva] had objected to his profiling training, both from his
Trooper Coach and Waldron." (Opposition Brief at 21)  The Court
has found no evidence in the record to support this contention.

[69]   The decision to transfer Oliva was made on or before
January 4, 2001, prior to the publication of the Philadelphia
Inquirer story.

that Oliva would have been the subject of harassment there as well, or at least, Oliva had some reason to fear working at that station.

Assuming without deciding that the transfer to Tuckerton Station, as opposed to Bass River Station, could deter a reasonable officer in Oliva's position from engaging in protected activity, no reasonable factfinder could find a causal connection between Oliva's complaints and Defendant Dunbar's decision to transfer him. Nothing in the record supports the finding or inference that Dunbar knew about Oliva's previous complaints.

Alternatively, Plaintiff has failed to establish pretext. First, Plaintiff concedes that there was nothing procedurally improper about the transfer. Second, nothing in the record contradicts or casts doubt on Dunbar's reasoning for choosing Tuckerton Station over Bass River Station. Dunbar testified:

> Somehow they had worked out an agreement that they were going to send [Oliva] to Bass River. I said, he's not going to go to Bass River . . . if he's going to be transferred, we'll transfer him to Tuckerton, which is as close to Bass River as you can be, but it's still within the same troop. . . .
>
> Q: Why was it that you did not care to allow Oliva to be transferred to Bass River?
>
> A: Because I had an organization of 3,000 people and I did not see a need to go to Bass River. I could see a need of . . . going out of [Woodbine] station, but I did not see a need to transfer to another troop and I did not want to set a precedent that if somebody chooses, they can just basically decide they're going to go to this station or that station. . . . the Bass River troopers were at the Tuckerton Station. I mean, Tuckerton was right off the Parkway, it's the same people. That was one of the things I looked at. I mean it wasn't like [he asked] . . . send me to Sussex . . .

> I would have probably given that more consideration. But basically the same people that are in the southern part of the state would have been in Bass River. . . . If [Oliva] wanted to go out of the troop area someplace, I would have given that stronger consideration than Bass River.

(Attwood Cert. Ex. V)  Plaintiff has failed to demonstrate any incoherencies, inconsistencies, or other anomalies that would suggest that Defendant Dunbar's explanation is not the true reason for his decision.

Summary judgment will be granted to Defendant Dunbar on the § 1981 claim.


*Defendants Schairer and Zulawski*

Plaintiff asserts that Defendants Schairer and Zulawski, in their attempts to secure the anonymous note Oliva had in his possession, continually harassed Oliva.  Specifically, Plaintiff points to undisputed evidence that Schairer repeatedly called Oliva at his home on several days[70] and then Schairer and Zulawski confronted Oliva in the sauna at Oliva's gym.  (Attwood Cert. Ex. W)  While conceding that Schairer and Zulawski did not violate any State Police regulation, Plaintiff asserts that the manner in which Schairer and Zulawski sought to obtain the evidence from Oliva was "unreasonable" and "harassing."

Assuming without deciding that Defendants' actions would have

---

[70]  It appears that at least some of the repeat calls resulted from a lost connection.  (Attwood Cert. Ex. W)

49

dissuaded a reasonable worker from making or supporting a charge of discrimination, the claim still fails because Plaintiff has put forth no evidence from which to infer that Defendants Schairer and Zulawski knew about Oliva's prior complaints.

There is no evidence that Defendants Schairer and Zulawski were stationed at either Bellmawr, Woodbine, or Buena Vista Stations, or had any communications with people at those stations who knew of Oliva's complaints.  Without any proof that Defendants knew or could have known about Oliva's complaints, there can be no inference of retaliatory motive.

Summary judgment will be granted to Defendants Schairer and Zulawski on the § 1981 claim.

*Defendants Armitage*

The undisputed record shows that Defendant Armitage was the person leading the Gallagher investigation, and that she recommended to Major Brennan that Oliva be changed from a complaint to a principal in that investigation.[71]  Plaintiff asserts that Armitage conducted the investigation in a manner calculated to place on Oliva most of the responsibility for the illegal stops.

A reasonable factfinder could conclude that Plaintiff has established a prima facie case.  Investigating a worker for alleged wrongdoing (indeed, illegal acts) could dissuade a reasonable

---

[71]  Although it was Brennan who ultimately approved the change, he has not been named a defendant to this suit.

worker from making or supporting a charge of discrimination.
Additionally, unlike several of the other Defendants, Defendants
Armitage's actions took place after the Philadelphia Inquirer story
was published.  Indeed, Defendant Armitage testified that the
Inquirer story was at least part of the reason for opening the
Gallagher investigation.  Therefore, the record supports a finding
that Armitage knew of Oliva's whistle-blowing.  A reasonable
factfinder could infer causation from these facts.

With regard to Defendant Armitage's reason for making Oliva a
principal, it is undisputed that Oliva admitted to falsifying
police reports and participating, at least in a limited manner, in
the allegedly illegal stops and searches conducted by Gallagher
during the Trooper Coach program.  Plaintiff asserts that a
reasonable trier of fact could nonetheless conclude that Oliva was
made a principal, not because he admitted to wrongdoing, but rather
for retaliatory reasons.

Plaintiff specifically relies on the undisputed evidence
regarding the timing of the decision and the infrequency of such a
decision.  According to Plaintiff, if Armitage's reason were the
true reason, she would have recommended that Oliva be named a
principal in the investigation when the investigation was first
opened.  Plaintiff further relies on Defendant Armitage's
undisputed testimony that based on her experience and knowledge,
she does not know of another time when a complainant was later
identified as the principal in the same investigation.

51

Defendants, however, have a plausible explanation for the timing of the decision to make Oliva a principal.  On the "New Principal Identification Form" which officially made Oliva a principal, Armitage wrote, "[t]o date [July 17, 2002], four motorists have provided taped statements which suggest Trooper Oliva is more culpable than Trooper Gallagher.  Two of these four motorists submitted to polygraph testing and were found to be truthful."  (Attwood Cert. Ex. GG)  According to Defendants, during the course of the investigation, the evidence suggested that Oliva had played a more central role in the allegedly illegal stops than he had admitted to during the December 10, 2001 interview (indeed, some of the evidence directly contradicted statements made during the interview), and it was for that reason that Oliva's status was changed at the time it was changed.

It is undisputed that in March of 2002, Defendant Armitage interviewed four people who had been pulled-over by Gallagher and Oliva, according to State Police records.  Of the four, one motorist could not say whether either Oliva or Gallagher had been the troopers who had stopped her, but stated that she had been stopped without committing a violation; two motorists reported that Oliva had stopped them by himself, without Gallagher being present[72]; and the last motorist identified Oliva as the trooper

_____

[72]  The two motorists, who are sisters, were interviewed separately about the same stop.  One sister was the driver and one sister was a passenger.  (Attwood Cert. Ex. EE)

52

who searched his car and intimidated him into disclosing where drugs were stashed in the car.  (Attwood Cert. Ex. EE)  According to the report, none of the motorists reported that one trooper gave orders to another trooper.  (Id.)

On July 5, 2002, Armitage received the results from the polygraph tests administered to two of the motorists. (Attwood Ex. FF)  Both motorists were determined to be telling the truth.  (Id.)  Notably, one of the motorists who reported that Oliva had acted alone was determined to be truthful.  (Id.)  Oliva was officially identified as a principal 12 days later.

Based on this record, the Court concludes that Plaintiff has not put forth sufficient evidence to support a finding of pretext.  There are no incoherencies or inconsistencies in Defendants' explanation for why Oliva was identified as a principal in July of 2002.  Moreover, the decision was based upon information provided by third-party witnesses outside the State Police, who were determined to be truthful.  Under these circumstances, the mere fact that changing a complainant to a principal may be a rare occurrence is insufficient to establish pretext.

Summary judgment will be granted to Defendant Armitage on the § 1981 claim.


*Defendant Dr. Izzi*

Plaintiff asserts that Dr. Izzi retaliated against Oliva by "ordering" him back to work, despite Dr. Puig's and Dr. Glass'

53

opinions that Oliva was not fit to return to duty, and Dr. Carty's determination that Oliva should remain on sick leave.

Assuming without deciding that Plaintiff has established a prima facie case, a reasonable factfinder could not find Dr. Izzi's reason for his decision pretextual.  Dr. Izzi testified that he determined that Oliva was fit to return to work based on the conclusions of an independent medical examination, which concluded that Oliva was fit to return to duty.  It is undisputed that at the time Dr. Izzi made his decision, Oliva had not yet been examined by Dr. Carty, and therefore, the only conflicting recommendations that existed at the time were those of Dr. Puig and Dr. Glass.  When asked why he decided Oliva was fit for duty despite the opinions to the contrary, Dr. Izzi explained that he prefers to rely on an "objective opinion by a third party" rather than treating physicians who are acting as "patient advocates."  (Buckman Cert. Ex. 38)  Specifically, Dr. Izzi explained, "[Doctors Puig and Glass] are patient advocates. . . . in my experience I have noticed that they will provide certain information that seems to always go . . . for the benefit of the individual. . . . I like to get further clarification [from] . . . an independent medical examination."  (Id.)

Plaintiff has not pointed to any evidence in the record which casts doubt on Dr. Izzi's explanation.  Moreover, his explanation appears to be quite plausible given that Oliva had already filed this lawsuit at the time Dr. Izzi was making his decision, and that

54

Dr. Glass' recommendation was addressed to Oliva's attorney.

Nonetheless, Plaintiff relies on the undisputed fact that Dr. Izzi later changed his mind as evidence of pretext.  However, Dr. Izzi's explanation for his change of decision, is equally as plausible as his initial decision.  Dr. Izzi stated that he changed his mind after hearing from Dr. Carty that Oliva reported using alcohol, which was not a fact that Oliva had disclosed to Dr. Izzi. (Attwood Cert Ex. QQ)  Plaintiff has put forth no evidence to cast doubt on Dr. Izzi's explanation.

Summary judgment will be granted to Dr. Izzi as to the § 1981 claim.


*Defendant Santiago*

Plaintiff asserts that Santiago retaliated against Oliva by allegedly attempting to force Oliva into resignation instead of being fired.

First, there is insufficient evidence in the record to support a finding of a materially adverse employment action.  It is undisputed that Oliva did not know of Defendant Santiago's decision about offering him resignation.  Logically, a reasonable worker cannot be dissuaded by a decision or action of which he is not aware.  Accordingly, the resignation decision cannot be a materially adverse action as a matter of law.

All that Oliva did know was that Defendant Santiago was considering not re-enlisting him.  No decision had been made at the

time.  Plaintiff has not put forth any evidence to support a
conclusion that a reasonable trooper in Oliva's position would be
dissuaded by a *potential* adverse decision that had not yet been
made.

Alternatively, assuming without deciding the other elements of
Plaintiff's prima facie case, Plaintiff has failed to demonstrate
pretext.  Defendant Santiago's undisputed testimony establishes
that the letter was the result of a Division-wide review,
undertaken for all of the approximately 100-120 members on sick
leave, to determine why they were not working.   (Attwood Cert. Ex.
LL)  Defendant Santiago explained,

> We reviewed why people were out, what we could do about
> it.  It was an opportunity to, you know, because of the
> pension, to hire somebody to replace them. . . .
>
> The goal of the group was to get them to come back, to
> find out why they didn't want to work. . . . They might
> have wanted to change assignments or get away from a
> particular supervisor . . . .
>
> And Oliva's name came up . . . at some point during
> this- all these discussions, that we had to do this four
> year reenlistment, and we're looking at whatever class
> it was . . . because they all have the same anniversary
> date.
>
> And I had asked for a report, an evaluation of each one
> of them. . . . I wanted to have something where we- if
> there was a problem . . . to give them an opportunity to
> correct or modify before the enlistment date was up
> rather than to just announce to them: 'You're not going
> to be here.' . . .
>
> I remember Oliva had not worked, and that's when I had
> authorized the letter to be sent to him.

(Id.)

Plaintiff has not put forth any evidence from which a reasonable factfinder could infer that Defendant Santiago's reason was pretextual.[73]

Because Plaintiff has failed to put forth sufficient evidence of an adverse employment action and pretext with respect to Defendant Santiago, summary judgment will be granted as to the § 1981 retaliation claim.

*The remaining Defendants: Meddis, Blaker, Cameron, Hagerty, Farmer, Gilman, Donlan, and Kilmurray*

As to the remaining Defendants, summary judgment will be granted on the § 1981 retaliation claim, <u>and all other claims</u>, because Plaintiff has not put forth sufficient evidence of each Defendant's involvement in the events at issue to sustain liability of any kind.

With regard to Defendants Farmer, Donlan, Hagerty, and Gilman, the record appears to be completely devoid of any evidence relating to them.  The Second Amended Complaint merely alleges that Defendant Farmer was Attorney General of New Jersey at the time, and thereby had supervisory authority over the State Police.  As to Defendant Donlan, Plaintiff alleges that Donlan was rude to Oliva

---

[73] Plaintiff argues that the "only reason" for Santiago determining that Oliva was in danger of not being reenlisted was "the effect on Oliva by the retaliation and harassment and false charges being preferred against him."  (Opposition Brief at 45) Even if Santiago's testimony could be interpreted that way, it does not prove that Santiago possessed a retaliatory motive.

over the telephone.  As to Defendant Hagerty, Plaintiff alleges that he "publicly alleged that [Oliva] was uncooperative in the investigation of [racial profiling by Gallagher]."  As to Defendant Gilman, the Second Amended Complaint only alleges, "Defendant H. MacFarland advised [Oliva] that he would be transferred far from home as per orders of Defendant Gilman because of the fact that [Oliva] had objected to Defendant Sokorai's treatment of him." Even these allegations have no support in the record.

Defendants, Meddis, Blaker, and Cameron each interviewed Oliva in connection with the internal investigations that were conducted. From the facts alleged, it appears that Plaintiff might have attempted to pursue § 1983 Fifth and Sixth Amendment claims against these Defendants, but as noted *infra*, Plaintiff has apparently abandoned those claims, and they are meritless in any event.  To the extent Plaintiff implicitly argues that the manner in which these Defendants conducted their interviews was harassing and retaliatory, there is insufficient evidence in the record to support such a claim.

Lastly, Defendant Kilmurray worked in the Medical Services Unit, although it is unclear what his actual position was.   The only evidence with regard to Defendant Kilmurray are letters he sent to Oliva notifying him that he had appointments with Dr. Izzi. (Attwood Cert Ex. NN)  Both letters indicate that Oliva was under orders to attend the appointments, and that failure to obey could result in discipline.  (Id.)  This evidence is insufficient to

sustain any of the claims asserted against Defendant Kilmurray.[74]

For all of the above-stated reasons, with respect to the § 1981 claim, summary judgment will be granted to all Defendants except Defendant Waldron.

**B.**

In addition to the § 1981 claim, Plaintiff asserts claims under 42 U.S.C. §§ 1985(3)[75] & 1986.[76]  To establish a claim under §

---

[74]  Alternatively, the claims asserted against Defendant Kilmurray fail on the merits for the same reasons that the claims against Dr. Izzi fail.

[75]  Title 42 U.S.C. § 1985(3) provides,

> If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

[76]  Title 42 U.S.C. § 1986 provides,

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in the preceding section [42 USCS § 1985], are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful

1985(3), the record must support a finding of the existence of a conspiracy motivated by race or class based animus, among other things. *Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997).[77]  A party is liable under § 1986 for neglectfully failing to prevent a violation of § 1985.  Liability under § 1986 is dependent on § 1985 liability. *Clark v. Clabaugh*, 20 F.3d 1290, 1295, 1295 n.5 (3d Cir. 1994).

Plaintiff boldly asserts that all of the Defendants acted in concert with one another, apparently by virtue of contributing to, or acquiescing in, the "troubled culture" which is endemic to the "monolith" that is the New Jersey State Police.  According to Plaintiff, "[t]his is a case of a monolithic, dysfunctional NJSP [New Jersey State Police] working against an individual who did not want to perpetuate a culture of racial profiling."  (Opposition Brief at 3)  Under this umbrella, Plaintiff attempts to attribute every alleged misdeed of each Defendant to all Defendants, by alleging that they were all engaged in a conspiracy.  However, nothing in the record supports a finding of a conspiracy among the Defendants.

---

act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case;

[77] The fact that Oliva complained about race-based animus directed at others does not defeat Plaintiff's claim.  *See Richardson v. Miller,* 446 F.2d 1247, 1249 (3d Cir. 1971).

Plaintiff asserts that "the record indicates a strong likelihood of conspiracy among members of the Division, from its leadership to its troopers, to its doctor." (Opposition Brief at 49)  Specifically, Plaintiff argues that "a reasonable juror could infer from the fact that many named Defendants had actual knowledge of [Oliva's] unwillingness to perpetuate the culture of racial profiling within the Division that others were informed and conspired to retaliate against [Oliva]." (Id.)  Plaintiff's argument fails.  "To constitute a conspiracy [under § 1985(3)], there must be a 'meeting of the minds.'" *Startzell v. City of Phila.*, 533 F.3d 183, 205 (3d Cir. 2008) (quoting *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158 (1970)).  Plaintiff has put forth no evidence from which a reasonable factfinder could infer that there was a meeting of the minds between any of the Defendants.

Because the § 1985(3) claim fails, the § 1986 claim also fails.  Summary judgment will be granted to all Defendants on these claims.

## C.

Plaintiff also asserts a claim pursuant to 42 U.S.C. § 1983, alleging that Defendants violated Oliva's Fourth, Fifth, Sixth, and Fourteenth Amendment rights.

Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be

61

subjected, any citizen of the United States or other
person within the jurisdiction thereof to the
deprivation of any rights, privileges, or immunities
secured by the Constitution and laws, shall be liable to
the party injured in an action at law, suit in equity,
or other proper proceeding for redress.

42 U.S.C. § 1983.

Fourth, Fifth, Sixth, and Purported First Amendment claims

Plaintiff makes no argument as to the Fourth, Fifth, or Sixth

Amendment claims asserted in the Second Amended Complaint.

Plaintiff does make a First Amendment argument, however, even

though a First Amendment violation has not been pled. Summary

judgment will be granted to all Defendants on the Fourth, Fifth,

and Sixth Amendment claims and Plaintiff will be denied leave to

amend the Second Amended Complaint to include a First Amendment

claim.

It is undisputed that Oliva was never charged with a crime.

Accordingly, the Sixth Amendment claim fails. *See Massiah v.

United States*, 377 U.S. 201 (1964) (Sixth Amendment right to

counsel attaches at the initiation of formal charges).

Similarly, Oliva was never "in custody" such that his Fifth

Amendment right to counsel would attach. Nor was Oliva compelled

to incriminate himself. *See Alston v. Redman*, 34 F.3d 1237, 1244

n.4 (3d Cir. 1994) ("As the Supreme Court has repeatedly noted, the

*Miranda* safeguards . . . serve only to protect the privilege

against self-incrimination in the context of a custodial

62

interrogation.").  Accordingly, the Fifth Amendment claim fails.[78]

Lastly, nothing in the record supports a conclusion that Oliva was subject to a search or seizure.  *See* U.S. Const. amend. IV (protecting against "unreasonable searches and seizures").  Thus, the Fourth Amendment claim fails.

As to the First Amendment claim, Plaintiff asks this Court for leave to amend.  This case was filed over seven years ago.  The original complaint was amended twice.  Now, after the close of discovery, at summary judgment, Plaintiff seeks to amend the Second Amended Complaint to add a claim that was apparent on the facts as they were known when the original complaint was filed.  Despite Plaintiff's arguments to the contrary, the Court concludes that Defendants would be prejudiced by allowing amendment under these circumstances.  Accordingly, the Court declines to exercise its discretion in favor of Plaintiff and leave to amend will be denied. *See Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000) ("Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility.").


Fourteenth Amendment claim

Plaintiff asserts procedural and substantive due process

---

[78]  Any due process claim under the Fifth Amendment also fails as none of the Defendants are federal actors. *See Malloy v. Hogan*, 378 U.S. 1, 26 (1964) ("'Due process of law is secured against invasion by the *federal* Government by the Fifth Amendment, and is safeguarded against *state* action in identical words by the Fourteenth.'")(emphasis added).

arguments.  Plaintiff seems to put forth the following theories:
(1) Defendants continually harassed Oliva with the intent of
forcing him to resign from the State Police, rather than going
through the proper termination process; (2) Defendants'
"harassment" caused Oliva to take his own life.

Because the Due Process Clause of the Fourteenth Amendment
protects life, liberty and property rights, the Court begins by
identifying which of Oliva's rights are implicated in this case.

The first issue is whether Oliva had a property interest in
his position as a Trooper recruit.  While Plaintiff correctly
acknowledges that property rights can be derived from state law,
*see Board of Regents v. Roth,* 408 U.S. 564, 577 (1972), Plaintiff
fails to identify any state law, contract, State Police written
policy, or "unwritten 'common law'" within the State Police,[79] that
created a property right in Oliva's job as a Trooper recruit.
Plaintiff admits that Oliva did not have tenure,[80] but claims,
without elaboration or factual support, that Oliva had a legitimate
expectation that he would be reappointed every two years.

New Jersey law provides that all troopers "shall be appointed
or reappointed by the superintendent for a period of two years, and

---

[79]  *Perry v. Sinderman*, 408 U.S. 593, 602 (1972); *see also
Stana v. Sch. Dist. of City of Pittsburgh,* 775 F.2d 122, 126 (3d
Cir. 1985) (property interests in employment may arise from
mutually explicit understandings between a government employer
and employee).

[80]  State troopers are eligible to receive tenure after five
continuous years of service.  N.J.S.A. 53:1-8.1.

shall be removable by him after charges have been preferred and a hearing granted." N.J.S.A. 53:1-8. The New Jersey Appellate Division has held that this statute does not give non-tenured officers a right to have charges preferred, a hearing held, and cause shown before denial of reappointment. *See Dunbar v. Kelly*, 114 N.J. Super. 450, 453 (App. Div. 1971), *certif. denied*, 59 N.J. 528 (1971).[81] Accordingly, it is clear that under New Jersey law, Oliva had no right to reappointment after the conclusion of his first two-year term. Therefore, he had no property interest upon which to base the procedural due process claim. Summary judgment will be granted to all Defendants on the procedural due process claim.

As to the substantive due process claim, Plaintiff asserts that Defendants' actions collectively caused Oliva to take his own

---

[81] *See also*, N.J. Att'y Gen. Formal Opinion No. 23 (1961) (stating that the Superintendent "may deny reappointment summarily" because "R.S. 53:1-8 fixes no requirement that the Superintendent reappoint members of the force at the termination of two year enlistment periods except upon a determination of cause for their removal and ancillary procedural safeguards."); *see generally, State of N.J. v. State Troopers Fraternal Ass'n*, 134 N.J. 393, 415 (1993)("Unlike police officers in municipalities subject to Civil Service whose appointment and promotions are governed by the merit-appointment process, . . . applicants for appointments to the State Police are required to establish to the satisfaction of the Superintendent their mental and physical fitness and general qualifications. State troopers are appointed and may be reappointed for two-year terms, and after five years of continuous service may continue as members of the State Police 'during good behavior.'")(internal citations omitted).

life.[82]  Plaintiff argues,

> [D]efendants were well aware of Oliva's mental condition
> and received continued reports from his treating
> psychiatrist and psychologist as well as from its own
> State Police medical staff.  Oliva was approved for
> stress leave and was medicated for depression and
> anxiety.  Yet [D]efendants continued to harass and
> retaliate against Oliva despite his condition, finally
> making him a principal in an investigation that was
> precipitated by his initial complaints of wrongdoing
> within the Division.

(Opposition Brief at 39)  Plaintiff asserts Defendants are liable

under a state-created danger theory.

"To prevail on a state-created danger theory in the Third

Circuit, a plaintiff must prove the following four elements:

> (1) the harm ultimately caused was foreseeable and
> fairly direct;
>
> (2) a state actor acted with a degree of culpability
> that shocks the conscience;
>
> (3) a relationship between the state and the plaintiff
> existed such that the plaintiff was a foreseeable victim
> of the defendant's acts, or a member of a discrete class
> of persons subjected to the potential harm brought about
> by the state's actions, as opposed to a member of the
> public in general; and
>
> (4) a state actor affirmatively used his or her
> authority in a way that created a danger to the citizen
> or that rendered the citizen more vulnerable to danger
> than had the state not acted at all."

*Stanford v. Stiles*, 456 F.3d 298, 304 (3d Cir. 2006); *see also*

*Phillips v. County of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008).

---

[82]  "Individuals have a constitutional liberty interest in
personal bodily integrity that is protected by the Due Process
Clause of the Fourteenth Amendment."  *Phillips v. County of
Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008).

Plaintiff asserts three affirmative acts forming the basis of this claim: (1) Defendant Armitage decided to make Oliva a principal in the Gallagher investigation; (2) Defendant Santiago's letter informing Oliva that he might not be reenlisted; and (3) Defendant Dr. Izzi's determination that Oliva was fit to return to full duty status.[83]  According to Plaintiff, these actions significantly increased Oliva's anxiety and depression, thereby leading to his suicide.

The Court concludes that no reasonable juror could conclude that Oliva's suicide was foreseeable; nor could a reasonable juror conclude that the Defendants acted with a degree of culpability that shocks the conscience.  Each element will be discussed in turn.[84]

To establish foreseeability, Plaintiff must point to evidence in the record from which a reasonable factfinder could find "an awareness on the part of the state actors that rises to the level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm."  *Phillips*, 515 F.3d at 238.  Here there is no evidence in the record that any of the Defendants were aware of the risk that Oliva might take his own

---

[83]  The record indicates that Dr. Izzi was a civilian member of the State Police.  As neither party has addressed this issue, the Court assumes without deciding that Dr. Izzi is a state actor.

[84]  The Court need not reach the other elements of the claim.

life.

As to Defendants Armitage and Santiago, nothing in the record suggests that they knew anything more than Oliva was on extended stress leave.  All correspondence from Oliva's treating psychologist and psychologist was sent to the State Police Medical Office.  Moreover, there is no evidence in the record that Armitage or Santiago had any communications with the Medical Office about Oliva's mental status.

Even if they did, none of the information possessed by the Medical Office suggested Oliva was a threat to himself.  All of the letters Dr. Puig sent to the Medical Office reported the same diagnoses of "Adjustment Reaction" and "Post-Traumatic Stress Disorder Symptoms."  (Buckman Cert. Ex. 31)  Dr. Puig also reported Oliva's symptoms: "hypervigilance, deregulated sleep, fear and rage, fear of retaliation if returned to work, severe anxiety." (Id.)  Nothing in the letters suggested that Oliva was a threat to himself.

The independent psychological evaluation of Oliva conducted on May 15, 2001, also revealed no suicidal tendencies.  Indeed, the report twice stated that "[Oliva] denied current or past suicidal or homicidal ideation." (Attwood Cert. Ex. MM)  Likewise, Dr. Carty's report, dated November 30, 2001, also states, "[Oliva] denies suicidal or homicidal ideation."  (Attwood Cert. Ex. Q)

Moreover, on September 11, 2002-- approximately three weeks before Oliva's suicide-- Oliva's psychiatrist reported to Dr. Izzi,

68

> '[o]ver the past two months, [Oliva] has been able to
> discontinue the use of the previously mentioned
> medications, has slept well, been free of severe anxiety
> and depression, and has discontinued the use of alcohol. .
> . . For all of these reasons, I feel that John Oliva is now
> fit to return to duty as a member of the New Jersey State
> Police Department.

(Buckman Cert. Ex. 32)  While Dr Puig's letter, dated a week later,

concluded that Oliva was *not* ready to return to duty, as already

noted, the letter said nothing about suicidal thoughts or

tendencies.  (Buckman Cert. Ex. 31 at OL05183)  Accordingly, the

Court holds that no reasonable factfinder could conclude that

Defendants were aware of risk that was sufficiently concrete to put

them on notice that Oliva would commit suicide.

Alternatively, a reasonable factfinder could not find that

Defendants Armitage, Santiago, and Dr. Izzi acted with the degree

of culpability that shocks the conscience.  "[T]hree possible

standards can be used to determine whether state action shocked the

conscience: (1) deliberate indifference; (2) gross negligence or

arbitrariness that indeed shocks the conscience; or (3) intent to

cause harm."  *Phillips,* 515 F.3d at 241.  "The time in which the

government actors had to respond to an incident" informs the choice

of standards: the level of culpability increases as the time for

deliberation decreases.  *Id.* at 240.  Relevant to the instant case,

"where officials are afforded the luxury of a greater degree of

deliberation and have time to make unhurried judgments, deliberate

indifference" is the appropriate standard of culpability.  *Id.*

It logically follows from the Court's foreseeability analysis

that no reasonable factfinder could find that Defendants acted with the requisite degree of culpability.  Defendants could not have been deliberately indifferent to a risk of which they were unaware (i.e., lacked actual subjective knowledge), nor was the risk so obvious that a factfinder might conclude that Defendants should have been aware of it.  *See Sanford*, 456 F.3d at 309 ("we note the possibility that deliberate indifference might exist without actual knowledge of a risk of harm when the risk is so obvious that it should be known.").  As discussed above, nothing in the record suggests that any person within the State Police possessed information that would have suggested that Oliva was suicidal.  No reasonable factfinder could conclude that Defendants' actions "shocked the conscience."  Accordingly, summary judgment is warranted.

Lastly, even if disputed issues of fact precluded summary judgment on the constitutional issue of whether Defendants violated Oliva's right to substantive due process, summary judgment would still be appropriate because Defendants are entitled to qualified immunity.

"The salient question we must ask is whether the law, as it existed in [2002], gave [Defendants] fair warning that their actions were unconstitutional."  *Estate of Smith v. Marasco*, 430 F.3d 140, 154 (3d Cir. 2005)("Smith II")(internal quotations and citations omitted).  Thus, in this case Plaintiff must show "that a reasonable officer in the position of [Defendants] would have

understood their conduct to be conscience shocking." *Id.*  Stated another way, Plaintiff must establish that "the contours of the right at issue were sufficiently clear that a reasonable official" would have understood that what he was doing violated Oliva's substantive due process right.  *Id.*

The Court holds that a reasonable officer in Defendants' position in 2002 would not have understood their conduct to be conscience shocking.  As the Third Circuit's decisions in *Smith II*, *Sanford*, and *Phillips* (all of which were decided in 2005 or later) make evident, the standard as to the appropriate level of culpability required of a state actor under a state-created danger theory has only been more fully developed in recent years.  Indeed, in 2005 *Smith II* observed that "[o]ur . . . decisions have not clarified [the shocks the conscience] element of the test to any great extent." 430 F.3d at 153.  Even this year *Phillips* observed, "[t]he Supreme Court has not fully explicated the standard of culpability in substantive due process cases generally, and our own jurisprudence is difficult to discern."  456 F.3d at 305.

Based on the foregoing, the Court concludes that in 2002 the law with regard to culpability of state actors in a state-created danger case was not sufficiently clear to put Defendants on notice that their actions violated the Fourteenth Amendment.  Accordingly, Defendants are entitled to qualified immunity and summary judgment is appropriate.

For all of the above stated reasons, summary judgment will be

71

granted to all Defendants on all of the § 1983 claims.

### D.

With respect to the CEPA and LAD claims, Defendants assert that CEPA's waiver provision precludes Plaintiff's LAD retaliation claim as a matter of law.  The Court agrees.

CEPA's waiver provision states,

> Nothing in this act shall be deemed to diminish the rights, privileges, or remedies of any employee under any other federal or State law or regulation or under any collective bargaining agreement or employment contract; except that the institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law.

N.J.S.A. 34:19-8.

In *Young v. Schering Corp.*, the New Jersey Supreme Court rejected a literal reading of the waiver provision, which would force employees to "choose between a CEPA claim and other legitimate claims that are substantially, if not totally, independent of the retaliatory discharge claim."  141 N.J. 16, 25 (1995).  Instead, the Court held,

> the wavier exception means, for purposes of this case, that once a CEPA claims is 'instituted,' any rights or claims for *retaliatory discharge* based on a contract of employment; collective bargaining agreement; State law, whether its origin is the Legislature, the courts, the common law rule of court; or regulations or decision based on statutory authority, are all waived.

*Id.* at 29 (emphasis added).  Thus, only plaintiff's claims that required a finding of retaliatory discharge were precluded by CEPA.

72

*Id.*  Claims that "'d[id] not resemble the alleged CEPA violations and require[d] different proofs than those needed to substantiate a CEPA claim'" were allowed to proceed.  *Id.* at 31.    Here, it is clear that Plaintiff asserts a retaliation claim under the LAD. Plaintiff asserts that Oliva was subjected to a hostile work environment in retaliation for opposing racial profiling prohibited by the LAD.  Thus, his LAD claim closely resembles, and does not require different proofs from, his CEPA claim. *See Bowen v. Parking Auth. of Camden,* No. 00-5765, 2003 WL 22145814, at *23 (D.N.J. Sept. 18, 2003)(Simandle, J.) (dismissing LAD claim as waived by the pursuit of CEPA claim because "'blowing the whistle' on discrimination [under LAD] is 'blowing the whistle' on a 'practice in violation of law' [under CEPA].").  Accordingly, summary judgment is warranted on the LAD claim.

Turning to the CEPA claim, the statute provides,

> An employer shall not take any retaliatory action against an employee because the employee does any of the following: . . . c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes: (1) is in violation of a law, or a rule or regulation promulgated pursuant to law.

N.J.S.A. 34:19-3(c)(1).

The familiar burden-shifting framework applies to CEPA retaliation claims:  A plaintiff must establish a *prima facie* case; then the burden shifts to the employer to provide a legitimate non-

retaliatory reason for the adverse employment action[85]; then the
burden shifts back to the plaintiff to demonstrate that the non-
retaliatory reason was pretext for a prohibited reason.   *See*
*Fleming v. Corr. Healthcare Solutions, Inc.,* 164 N.J. 90, 100
(2000).   To establish a *prima facie* case of retaliation under
CEPA, Plaintiff must establish (1) his reasonable belief that his
employer's conduct violated a law, rule, or regulation; (2) a
whistle-blowing activity; (3) an adverse employment action; and (4)
a causal connection between her whistle-blowing activity and the
adverse employment action. *See Caver v. The City of Trenton*, 420
F.3d 243, 254 (3d Cir. 2005); *Dzwonar v. McDevitt*, 177 N.J. 451,
462 (2003).

As is apparent from the Court's previous discussion of the §
1981 retaliation claim, the elements of that claim and a CEPA claim
are almost identical.   Accordingly, the Court's analysis at
Section A *supra* is equally applicable to Plaintiff's CEPA claim.
Summary judgment on the CEPA claim will be granted to all
Defendants except Defendant Waldron.


**E.**

In its opposition brief, Plaintiff asserts a claim pursuant to
N.J.S.A. 10:6-2, the "New Jersey Civil Rights Act."   As Defendants

---

[85] CEPA prohibits "retaliatory action" which is defined as
"discharge, suspension or demotion of an employee, or other
adverse employment action taken against an employee in the terms
and conditions of employment."   N.J.S.A. 34:19-2(e).

correctly observe, the Second Amended Complaint does not assert a New Jersey Civil Rights Act claim.  Even if the Court interpreted Plaintiff's submissions as requesting leave to amend, which it does not,[86] leave would be denied for the same reasons leave is denied as to the First Amendment claim.[87]

Plaintiff nonetheless argues that it may assert its claim directly under the New Jersey Constitution, which was pled in the Second Amended Complaint.  This argument also fails because this Court previously granted Defendants' Motion to Strike the claim under the New Jersey Constitution, "provided that Plaintiff may move to re-plead that claim upon such terms as may be established during the discovery period by the [U.S. Magistrate Judge presiding over this case]." Order of May 28, 2002.  The docket shows no motion by Plaintiff to re-plead the claim.  As the claim was previously dismissed, the Court need not reach the legal merits of Plaintiff's New Jersey State Constitution claim.

---

[86]  Plaintiff specifically requests leave to amend the Second Amended Complaint to add a First Amendment claim but says nothing about a New Jersey Civil Rights Act claim.

[87]  Additionally, amendment might be futile because the New Jersey Civil Rights Act was enacted in 2004-- long after the events giving rise to this suit.  While no court seems to have addressed the issue, and this Court need not decide the issue, nothing in the statute's legislative history suggests that the statute was intended to apply retroactively.  *See* S. 211-1558 (N.J. 2004); Assem. 211-2073 (N.J. 2004) *available at* http://www.njstatelib.org/NJLH /lh2004/ch143.htm.

**F.**

Lastly, summary judgment will be granted on all remaining claims against the State of New Jersey.  Plaintiff has made no argument whatsoever as to why the injunctive relief sought in the Second Amended Complaint is justified in this case, and no basis for granting such relief is apparent on this record.

**IV.**

For the foregoing reasons summary judgment will be denied as to the retaliation claims under § 1981 and CEPA against Defendant Waldron.  Summary judgment will be granted to all Defendants in all other respects.  The Court will issue an appropriate order.

Dated: September 30, 2008

    s/ Joseph E. Irenas
**Joseph E. Irenas, S.U.S.D.J.**